[No. H016392. Sixth Dist. July 22, 1998.]

THE PEOPLE, Plaintiff and Appellant, v.
TAYMON JABARR JACKSON, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to rules 976(b) and 976.1 of the California Rules of Court, the respondent's request for partial publication is GRANTED. The opinion filed July 22, 1998, is ordered certified for publication with exception of DISCUSSION parts I, II, III, IV, V, VII and Cumulative Error.

COUNSEL

David Y. Stanley, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald E. Niver and Clifford K. Thompson, Deputy Attorneys General, for Plaintiff and Appellant.

OPINION

**MIHARA, J.**—Defendant Taymon Jabarr Jackson appeals from a judgment of conviction entered after a jury found him guilty of the following: count 1

—kidnapping with intent to commit forcible oral copulation/sodomy (Pen. Code, § 208, subd. (d));[1] count 2—first degree burglary (§ 459); count 3—forcible oral copulation (§ 288a, subd. (c)); count 4—forcible oral copulation (§ 288a, subd. (c)); count 6—forcible sodomy (§ 286, subd. (c)); count 7—kidnapping to commit robbery (§ 209, subd. (b)); count 8—kidnapping (§ 207, subd. (a)); count 9—robbery (§ 211); count 10—forcible oral copulation (§ 288a, subd. (c)); count 11—forcible oral copulation (§ 288a, subd. (c)); count 13—forcible rape (§ 261, subd. (a)(2)); count 14—forcible rape (§ 261, subd. (a)(2)); count 16—robbery (§ 211); and count 17—kidnapping to commit sodomy or oral copulation (§ 208, subd. (d)). The jury also found true allegations under sections 667.61 and 667.8, subdivision (a) as to counts 3, 4, 6, 10, 11, 13, and 14. The trial court sentenced defendant to concurrent terms of 25 years to life on counts 3 and 10 and to a concurrent life term on count 7. These terms were to be served consecutively to a total determinate term of 19 years and 4 months.

On appeal defendant raises contentions relating to the admissibility of DNA evidence, jury instructions regarding reasonable doubt, consciousness of guilt and sexual assault, victim anonymity, the admissibility of evidence of a victim's emotional reaction to the crime, and sentencing. The People have filed a cross-appeal in which they argue the trial court erred in sentencing defendant to concurrent, rather than consecutive, life terms. For the reasons stated below, the conviction for simple kidnapping is reversed. The judgment is modified to provide consecutive life sentences on counts 3, 7, and 10. In all other respects, the judgment is affirmed.

*Statement of Facts*

*February 6, 1996: Jane Doe 1 (Counts 1-9)*

About 11 p.m. on February 6, 1996, Jane Doe 1 parked her car and walked toward her apartment building in Marina. As she climbed the stairs to her apartment, a man on the sidewalk pointed a gun at her and said, "Don't move or I'll shoot you." He then told her to descend the stairs. When she reached the bottom stair, he stood behind her, held the gun against her back, and warned, "Don't make any noise." Jane Doe 1 led the man to her car as instructed, but told him it did not have much gas when he said they were going for "a little ride."

After telling Jane Doe 1 "he was on the run for murder" and would not hesitate to shoot her if she did something stupid, he asked her which apartment was hers. As they walked toward it, he asked her if she lived with

---

[1]All further statutory references are to the Penal Code unless otherwise stated.

someone and she said no. They entered the apartment and he pushed her into the bedroom. He tied her nightshirt around her head and forcibly removed her clothes. Forcing her to her knees, the man placed the gun at her temple and threatened to shoot her if she did not orally copulate him. She complied. He then asked her if she had any condoms. She gave him one and heard him tear open the wrapper before he attempted anal intercourse. Asked if she was penetrated, Jane Doe 1 answered, "All I know is that it hurt. I did feel pressure and I felt pain." After two or three minutes, he stopped and forced her to orally copulate him again.

The man then told her to dress herself while blindfolded. As he was ransacking the room, he allowed her to lift the blindfold to find her shoes. However, when she glanced at him, he "freaked out" and told her he would have to kill her because she had looked at him.

The man asked Jane Doe 1 if she had any money or an automated teller machine (ATM) card. She told him she had an ATM card. He removed the blindfold, smoothed her hair, and directed her to her car. They drove to Coast Federal Bank on Reservation Road. The man then instructed her to cross the street and withdraw all her money from the ATM. She told him the bank would allow only a $300 withdrawal. He replied, "Get it," and told her not to try anything because he could shoot her from where he was standing. Jane Doe 1 withdrew 15 $20 bills which he withdrew from her pocket at the median street divider. Her ATM receipt reflected a 12:38 a.m. $300 withdrawal. The man told her to walk to a nearby trash can to retrieve her purse without turning around. Jane Doe 1 found the purse, walked to a pay phone, and dialed 911. The police arrived within a minute and subsequently took her to Natividad Hospital for a sexual assault examination.

Jane Doe 1 could not positively identify defendant as her assailant. However, she described her assailant as a Black male, about five feet nine inches or five feet eleven inches, with a medium build, in his late teens or early twenties, with "droopy" eyes. His voice was "somewhat" deep and he "slurred [the] endings of words." The man was wearing a dark long-sleeved midthigh-length jacket with a hood, dark pants, dark tennis shoes, and dark knit gloves. Jane Doe 1 also testified that though she believed the man's gun was real at the time, it "sounded plastic."

Officer Joseph Deras reached Jane Doe 1 while she was still on the pay phone. "She was crying, was very upset," and said that she had been raped and robbed. Officer Deras confirmed that her apartment had been ransacked and he found the used condom.

*February 7, 1996: Jane Doe 2 (Counts 10-17)*

About 8 p.m. on February 7, 1996, Jane Doe 2 left her home in Marina to walk to Kmart. As she walked along Locke-Paddon Park, she heard someone walking behind her. When she crossed Reservation Road, a man grabbed her from behind and said, "Don't scream and don't try to run. I have a gun." He then forced her in the direction of some restrooms.

Jane Doe 2 tried to escape, but the man wrestled her to the ground. He straddled her as she lay on her back and hit her several times. He then told her to remove her clothes and orally copulate him. Though she choked, he forced her to do it again. The man next vaginally penetrated her from behind. After he withdrew, he ordered her to lie on her back and he entered her again.

The man demanded money. He also told her that he had killed someone and the police were looking for him. Jane Doe 2 gave him $11 and the change in her purse, but he was not satisfied. She said she had an ATM card and he told her he wanted $300 to get out of town. They walked through the park and crossed Reservation Road. He arranged her hair.

As they approached the bank, the man warned her that he had a gun and could kill her. Jane Doe 2 withdrew $140 in $20 bills from the ATM. She gave him two ATM receipts to show she had exhausted her account. He returned the receipts which she placed in her pocket. He told her to walk away from him without turning around. She went to a restaurant and asked for help. The police arrived within a few minutes and took her to the hospital for a sexual assault examination.

Jane Doe 2 described her assailant as a Black male in his "early twenties, about five feet nine inches," with a medium to slender build, with "almost a deep voice." He was wearing a dark hooded long-sleeved thigh-length jacket.

Three days after the assault, Officer Margaret Basa collected two ATM receipts which Jane Doe 2 had found in her pocket. Michael Murphy, a latent print examiner at the Department of Justice, examined the receipts and compared the prints on the receipts with those of defendant. Murphy positively identified the fingerprints on the ATM receipts as having been made by defendant.

*February 8, 1996: Suspect Flees*

About 6 p.m. on February 8, 1996, Marina police officers established surveillance of the area in which the assaults had occurred. About 7 p.m.

Officer James Clegg noticed a person matching the suspect's description. The officer approached the suspect who "immediately took off running, and ran through an apartment complex," disappeared over a fence, and headed towards the Food Corral. Officer Clegg did not catch the individual, but he noticed a toy gun on the ground where the suspect had run. Susan Clark, a fingerprint technician, compared the prints on the gun with those of defendant. She positively identified the latent prints as being made by defendant.

*February 9, 1996: Defendant's Arrest*

On the morning of February 9, 1996, Rick Flores, who lived in one of two mobilehomes behind the Food Corral, noticed a pair of black knit gloves in the yard. The gloves did not belong to either Flores or May White, the occupant of the other trailer. About a minute after he saw the gloves, Flores saw defendant in the yard. Defendant's head was down as if he were looking for something. Flores asked defendant what he was doing there. Defendant said that his friend lived in one of the mobilehomes and left. Flores knew this was not true and called the police.

About 8:18 a.m., Officer Jeffrey Carr, who was responding to a suspicious person report, saw defendant walk from the fence line of the Lazy Wheel Trailer Park near the Food Corral to his mother's car. When the officer asked him what he was doing, defendant said he was looking for his jacket which he thought he had left at a friend's house. After Officer Michael Drain arrived, defendant told him that he had jumped a couple of fences in order to get his jacket from Dennis Welch. Defendant pointed to fences in the area of the Food Corral and the Lazy Wheel Trailer Park. However, Officer Drain knew Dennis Welch did not live in the area. Defendant was arrested for prowling.

During a booking search it was discovered that defendant had $356, including 16 $20 bills, on his person. When the police attempted to take a booking photo, defendant repeatedly sucked in his cheeks in order to alter his appearance. Defendant also insisted that he should be released for lack of probable cause. The police directed defendant to remove his clothing while standing in the middle of a sheet. Defendant said he knew the police would collect any hair samples that fell from his body or clothing and moved to the edge of the sheet to disrobe. After removing his boxer shorts, defendant snapped them towards the showers before dropping them on the sheet.

Defendant lived in an apartment off Reservation Road. A search of his room disclosed a pair of black tennis shoes and a pair of jeans that were damp and dirty on the front of the legs.

*DNA Evidence*

Brian Burritt, a criminalist at the Department of Justice, examined blood samples from Jane Doe 1, Jane Doe 2, defendant, and Jane Doe 1's boyfriend. Burritt determined that the evidence samples contained sufficient DNA to use the restriction fragment length polymorphism (RFLP) method, which is more discriminating than the polymerase chain reaction (PCR) method. Samples on the vaginal swab and pants taken from Jane Doe 2 were found to be consistent with defendant's DNA. Burritt testified that only one in 470 million African-American males would have the DNA profile detected in defendant's blood sample and in the seminal fluid on Jane Doe 2's pants and vaginal swab.

*Discussion*

I.-V.*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

VI.   *Lesser Included Offense*

Defendant was convicted of three counts of kidnapping Jane Doe 1: kidnapping to commit sodomy or oral copulation (count 1); kidnapping to commit robbery (count 7); and simple kidnapping (count 8). Defendant contends his simple kidnapping conviction must be reversed, because it is a lesser offense necessarily included within the offenses of kidnapping to commit robbery and kidnapping to commit sodomy or oral copulation. We agree.

"[D]efendants may be charged with and convicted of multiple offenses based on a single act or indivisible course of conduct." (*People* v. *Pearson* (1986) 42 Cal.3d 351, 354 [228 Cal.Rptr. 509, 721 P.2d 595].) However, "multiple convictions may *not* be based on necessarily included offenses." (*Id.* at p. 355.)

The People concede that kidnapping is a lesser offense included within the offenses of kidnapping to commit robbery and kidnapping to commit sodomy or oral copulation. They argue, however, that the simple kidnapping conviction was based on defendant's act of forcing Jane Doe 1 from her apartment stairway to her car. Thus, the People's argument assumes a kidnapping can be divided into separate acts which result in multiple convictions.

*See footnote, *ante*, page 182.

In *People* v. *Thomas* (1994) 26 Cal.App.4th 1328 [32 Cal.Rptr.2d 177], the court held otherwise. In *Thomas*, the defendant abducted the victim at a mall, indicated he wanted money, and took various items. He eventually stopped the vehicle and committed various sexual offenses. The defendant then drove the victim to her apartment where he told her to get her ATM card. The jury convicted the defendant of two counts of kidnapping to commit robbery. The *Thomas* court held the defendant could be convicted of only one count of kidnapping to commit robbery, since there was a single abduction followed by a continuous period of detention. (*Id.* at pp. 1334-1335.) Similarly here defendant's conduct of kidnapping Jane Doe 1 cannot be divided into separate incidents to permit multiple convictions. Accordingly, his conviction for simple kidnapping must be reversed.

VII. *Applicability of Section 654**

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Cumulative Error**

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Cross-appeal*

*Applicability of Section 667.6, Subdivision (d) to Section 667.61*

◼◼◼ The trial court sentenced defendant to two terms of twenty-five years to life for the forcible oral copulation of Jane Doe 1 (count 3) and Jane Doe 2 (count 10) and to a life term for kidnapping to commit robbery (count 7). The prosecutor argued that section 667.6, subdivision (d) mandated that both terms for forcible oral copulation be served consecutively. However, the trial court concluded that section 667.6, subdivision (d) did not apply to indeterminate sentencing under section 667.61 and imposed concurrent terms. The People contend the trial court imposed an unauthorized sentence by failing to impose consecutive terms.

Section 667.6, subdivision (d) provides in relevant part: "*A full, separate, and consecutive term shall be served for each violation* of . . . committing sodomy or oral copulation in violation of Section 286 or 288a by force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person *if the crimes involve separate victims* or involve the same victim on separate occasions. [¶] . . . [¶] The term shall be served consecutively to any other term of imprisonment and shall commence from

*See footnote, *ante*, page 182.

the time the person otherwise would have been released from imprisonment . . . ." (Italics added.)

■ " 'The fundamental purpose of statutory construction is to ascertain the intent of the lawmakers so as to effectuate the purpose of the law. [Citations.] In order to determine this intent, we begin by examining the language of the statute. [Citations.] But "[i]t is a settled principle of statutory interpretation that language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend." [Citations.] Thus, "[t]he intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act." [Citation.] Finally, we do not construe statutes in isolation, but rather read every statute "with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness." ' " (*People* v. *Thomas* (1992) 4 Cal.4th 206, 210 [14 Cal.Rptr.2d 174, 841 P.2d 159].)

■ Section 667.6, subdivision (d) mandates consecutive sentencing on its face and as judicially interpreted. (*People* v. *Jones* (1988) 46 Cal.3d 585, 595, 598 [250 Cal.Rptr. 635, 758 P.2d 1165].) In 1979, when section 667.6, subdivision (d) was enacted, each of the offenses which were made subject to mandatory consecutive sentencing was punishable by a term of years. However, in 1994, the Legislature enacted section 667.61 which is commonly known as the one strike law. (*People* v. *Rayford* (1994) 9 Cal.4th 1, 8 [36 Cal.Rptr.2d 317, 884 P.2d 1369].) When a defendant has been convicted of a specified sexual offense under specified aggravating circumstances, the trial court is required to sentence him or her to a lengthy indeterminate term depending on the circumstances.[5] Thus, the Legislature authorized life terms in section 667.61 for seven offenses listed in section 667.6, subdivision

---

[5]Former section 667.61 provided in relevant part: "(a) A person who is convicted of an offense specified in subdivision (c) under one or more of the circumstances specified in subdivision (d) or under two or more of the circumstances specified in subdivision (e) shall be punished by imprisonment in the state prison for life and shall not be eligible for release on parole for 25 years . . . . [¶] . . . [¶] (c) This section shall apply to any of the following offenses: [¶] . . . [¶] (6) Sodomy or oral copulation in violation of Section 286 or 288a by force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person. [¶] . . . [¶] (d) The following circumstances shall apply to the offenses specified in subdivision (c): [¶] . . . [¶] (2) The defendant kidnapped the victim of the present offense and the movement of the victim substantially increased the risk of harm to the victim over and above that level of risk necessarily inherent in the underlying offense in subdivision (c). [¶] . . . [¶] (4) The defendant committed the present offense during the commission of a burglary, as defined in subdivision (a) of Section 460, with intent to commit an offense specified in subdivision (c). [¶] (e) The following circumstances shall apply to the offenses specified in subdivision (c): [¶] (1) Except as provided in paragraph (2) of subdivision (d), the defendant kidnapped the victim of the present offense in violation of Section 207, 208, 209, or 209.5. [¶] (2) Except as provided in paragraph (4) of subdivision (d), the defendant committed the present offense during the commission of a burglary . . . . [¶] . . . [¶] (5) The

(d), when those offenses involved specified aggravating circumstances. (§ 667.61, subds. (c) and (d).) At issue then is whether section 667.6 applies to indeterminate terms imposed under section 667.61.

The language of section 667.6, subdivision (d) is quite broad and inclusive and does not distinguish between consecutive service of determinate and indeterminate terms. Had the Legislature chosen to make that distinction, it could have added explicit language to section 667.6, subdivision (d). ■ Moreover, "[t]he Legislature 'is deemed to be aware of statutes and judicial decisions already in existence, and to have enacted or amended a statute in light thereof.' " (*People* v. *McGuire* (1993) 14 Cal.App.4th 687, 694 [18 Cal.Rptr.2d 12].) ■ Accordingly, since no amendment to section 667.6 was made when the one strike law was enacted, there is no basis for the inference drawn by the trial court that the Legislature intended to distinguish between determinate and indeterminate terms in section 667.6.

Defendant points out, however, that section 667.6, subdivision (d) provides for a "*full*, separate, and consecutive term" which created an exception to the limitation of unstayed consecutive terms to one-third the middle term of the applicable offense. (See § 1170.1, subd. (a).) Thus, he argues the word "full" would be surplusage if applied to indeterminate terms, which are not subject to a comparable reduction. We disagree. Each of the specified offenses which are subject to mandatory consecutive sentencing under section 667.6, subdivision (d) is punishable presently as well as when the statute was enacted by a term of years. Accordingly, the word "full" is not surplusage, but is merely irrelevant to the operation of section 667.6, subdivision (d) in conjunction with section 667.61, subdivision (g).

We also note that section 667.61, subdivision (g) specifically refers to section 667.6. Defendant, however, contends this reference to section 667.6 is meaningless, because section 667.61, subdivision (g) "expressly governs only cases involving one or more crimes on the same occasion." He points out that he sexually assaulted different women on separate occasions.

Former section 667.61, subdivision (g) stated: "The term specified in subdivision (a) or (b) shall be imposed on the defendant once for any offense

defendant has been convicted in the present case or cases of committing an offense specified in subdivision (c) against more than one victim. [¶] . . . [¶] (f) If only the minimum number of circumstances specified in subdivision (d) or (e) which are required for the punishment provided in subdivision (a) or (b) to apply have been pled and proved, that circumstance or those circumstances shall be used as the basis for imposing the term provided in subdivision (a) or (b) rather than being used to impose the punishment authorized under any other law, unless another law provides for a greater penalty . . . . Notwithstanding any other law, the court shall not strike any of the circumstances specified in subdivision (d) or (e)." (Stats. 1994, First Ex. Sess., 1993-1994, ch. 14, § 1.)

or offenses committed against a single victim during a single occasion. If there are multiple victims during a single occasion, the term specified in subdivision (a) or (b) shall be imposed on the defendant once for each separate victim. Terms for other offenses committed during a single occasion shall be imposed as authorized under any other law, including Section 667.6, if applicable." (Stats. 1994, First Ex. Sess., 1993-1994, ch. 14, § 1.)

Since the second sentence of subdivision (g) requires multiple terms for multiple victims on the same occasion, the first sentence may only be reasonably interpreted as providing separate terms for offenses committed on each single occasion. Any other interpretation would punish an offender who victimizes different women on the same occasion more severely than an offender who victimizes different women on different occasions. To construe section 667.61 as defendant suggests would create an absurd result which the Legislature did not intend. (See *People* v. *Thomas, supra,* 4 Cal.4th 206, 210.) Moreover, this reference reflects the Legislature's awareness of the combined effect of these two provisions on the length of sentences.[6]

Defendant contends that if section 667.6 mandates consecutive terms the case must be remanded for resentencing. Analogizing the instant case to *People* v. *Superior Court (Romero)* (1996) 13 Cal.4th 497 [53 Cal.Rptr.2d 789, 917 P.2d 628], he argues section 667.61, subdivision (f) does not limit a trial court's authority to strike findings.

At issue is whether the Legislature has in "unmistakable terms" stated its intention to eliminate the trial court's authority to strike the section 667.61 enhancement in the instant case. (See *People* v. *Luckett* (1996) 48 Cal.App.4th 1214, 1218 [56 Cal.Rptr.2d 37].) Two courts have recently decided this issue and held the trial court has no such authority. (*People* v. *Espino* (1997) 53 Cal.App.4th 92 [61 Cal.Rptr.2d 350]; *People* v. *Estrada* (1997) 57 Cal.App.4th 1270 [67 Cal.Rptr.2d 596].)

As the court explained in *People* v. *Estrada, supra,* 57 Cal.App.4th 1270, 1277, "[t]he analogy to *Romero* does not work in one strike cases because, unlike the three strikes law, the one strike law specifically provides: 'Notwithstanding any other law, the court shall not strike any of the circumstances specified in subdivision (d) or (e).' (§ 667.61, subd. (f).) Having

---

[6]The Senate Committee on Judiciary's May 17, 1994, Analysis of Senate Bill No. 26X (1993-1994 First Ex. Sess.) which was enacted as section 667.61 states: "The life sentence would be in addition to all other sentences applicable to the defendant and would result in consecutive life sentences for each victim."

been pled and proven, the circumstance of [the specified offense] which gives rise to the 25 years to life punishment under section 667.61, subdivision (d) 'shall not' be stricken. [Citations.]" We agree with the *Estrada* court's analysis and conclusion.

### *Disposition*

The conviction for simple kidnapping is reversed. The judgment is modified to provide consecutive life sentences on counts 3, 7, and 10. In all other respects, the judgment is affirmed.

Cottle, P. J., and Bamattre-Manoukian, J., concurred.

The petition of appellant Taymon Jabarr Jackson for review by the Supreme Court was denied November 4, 1998. Mosk, J., Kennard, J., and Chin, J., were of the opinion that the petition should be granted.