Filed 1/24/14  P. v. Cortez CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>RUDY A. CORTEZ,<br><br>Defendant and Appellant. | B245332<br><br>(Los Angeles County<br>Super. Ct. No. BA375790) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Curtis B. Rappe, Judge.  Affirmed as modified.

Daniel G. Koryn, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Stephanie A. Miyoshi and Connie H. Kan, Deputy Attorneys General, for Plaintiff and Respondent.

Following a jury trial, defendant Rudy A. Cortez was convicted of 23 counts of forcible rape, forcible oral copulation, and forcible sodomy, and five counts of kidnapping to commit another crime.[1]  As to each forcible sex crime, the jury found true the special allegations that subjected defendant to the "One Strike" law.[2]  (§ 667.61.) Defendant received a sentence of 600 years to life under that law.[3]

In this appeal from the judgment, defendant raises issues of insufficient evidence, instructional error, failure to instruct on lesser included offenses, improper admission of evidence, and cruel and unusual punishment.   Although we reject those contentions, we modify the judgment to correct the sentencing errors raised by the Attorney General.

---

[1]    Although the information was numbered counts 1 through 42, only 28 counts were presented to the jury.  As to the remaining 14 counts, five counts contained no allegations (10, 14, 26, 36 & 37), and nine counts were dismissed upon the prosecution's motion (11, 30, 31, 32, 33, 34, 35, 40 & 42).
      The jury returned guilty verdicts on all 28 counts, consisting of 10 counts of forcible oral copulation (Pen. Code, § 288a, subd. (c)(2) (counts 1, 3, 5, 8, 12, 16, 19, 22, 28, 38)), 11 counts of forcible rape (§ 261, subd. (a)(2) (counts 2, 6, 7, 9, 13, 17, 20, 23, 25, 29, 39)), two counts of forcible sodomy (§ 286, subd. (c)(2) (counts 18, 24)), and five counts of kidnapping to commit another crime (§ 209, subd. (b)(1) (counts 4, 15, 21, 27, 41)).
      Unless otherwise indicated, all further statutory references are to the Penal Code.

[2]    The jury found true the special allegations of personal use of a knife (§§ 12022.3, subd. (a), 667.61, subd. (e)(3)), sex crimes committed against multiple victims (§ 667.61, subd. (e)(4)), kidnapping during the commission of a crime (§ 661.61, subd. (e)(1)), and kidnapping during the commission of a crime where the movement substantially increased the risk of harm (§ 667.61, subds. (a), (d)).

[3]    The trial court imposed 24 consecutive sentences of 25 years to life on counts 1-3, 5-9, 12-13, 16-20, 22-25, 28-29, 38-39, and 41, and stayed the four-year enhancement under section 12022.3, subdivision (a) as to those counts.  The court also imposed four terms of life with possibility of parole on counts 4, 15, 21, and 27, which were stayed pursuant to section 654.

## BACKGROUND

The prosecution alleged that between November 18, 2008, and September 8, 2010, defendant sexually assaulted the following women at knifepoint: (1) Dominique S. on November 18, 2008 (counts 12, 13); (2) Leticia K. on June 20, 2010 (counts 15-16, 19, 17-18, 20); (3) A.J. on July 30, 2010 (counts 27-29); (4) Jayme M. on August 1, 2010 (counts 21-24); (5) D.S. on August 19, 2010 (counts 8-9); (6) L.H. (referred to in the clerk's transcript as Alyssa H.) in September 2010 (counts 38-39, 41); (7) Erica W. (referred to in the clerk's transcript as Erika W.) on September 1, 2010 (counts 4-6); and (8) Nancy M. on September 8, 2010 (counts 1-3).

The police arrested defendant while the eighth victim, Nancy, was still in his car. Shortly after midnight on September 8, 2010, Los Angeles Police Department Officer Samuel Huizar and his partner were patrolling an area known for high prostitution and narcotics activity when they noticed a gray Mustang that was double-parked with its engine running and windows fogged. While Huizar was speaking with the driver (defendant), the front passenger (Nancy) began screaming for help. Both were ordered out of the car.

When Nancy exited the vehicle, she was crying and holding a bra in her hands. Defendant was sweating profusely and his belt was undone, his shirt was untucked, and his pants were unzipped. Nancy gave a statement that led to the recovery of a knife, handcuffs, and condoms from a compartment in the driver's side door. Defendant was arrested and his car was impounded. Nancy was taken to the hospital for a sexual assault examination.

A further search of defendant's car led to the recovery of personal items belonging to the other seven victims: (1) Dominique's driver's license; (2) Leticia's cell phone, identification card, and Social Security card; (3) A.'s friend's driver's license; (4) Jayme's identification card; (5) D.'s identification card, Social Security card, and driver's permit; (6) L.'s identification card, Social Security card, knife, and hoop earrings; and (7) Erica's identification card and cell phone.

3

After defendant was given a *Miranda*[4] warning, he was asked about the "different female identifications" found in his car. Initially, he said the identifications belonged to "[g]irls that I have chilled with" and "[g]irls that I've kicked it with." Later in the interview, he admitted that the "same thing happened" with each of the women. He stated: "I picked them up, too." "I just picked them up. Same thing happened." "All the girls are the same. All the girls are the exact same." During the last "seven or eight years," there were "[e]ight to 10" "girls" and "I picked them up." Eventually, defendant admitted that he had sex with all of the women while he held a knife to their throats. He stated, "I picked them up and drove to a — to a location where ever it was and — and they all performed sexual acts on me while I had a knife on their throat." When asked whether the women had wanted him to use a knife, he admitted, "No, they didn't." He explained that he used the knife because he "didn't want to pay for it." He said that he told one of the women that he was a sheriff, he handcuffed "the last two" women (Erica and Nancy), and he blindfolded all of them with their bras "[e]very time they got out of the car."

At trial, seven of the eight victims testified that defendant had sexually assaulted them at knifepoint. They uniformly testified that defendant had forced them to engage in sexual acts by holding a knife to their throats and threatening to injure or kill them if they failed to comply. Only one victim, Erica, did not testify at trial. Over defendant's objection, the trial court admitted Erica's preliminary hearing testimony after finding that she was unavailable as a witness. Other facts relevant to the issues on appeal will be discussed later in this opinion.

---

[4]     *Miranda v. Arizona* (1966) 384 U.S. 436.

# DISCUSSION

## I.    Insufficient Evidence

Defendant's claim of insufficient evidence is based on the testimony of five victims (Nancy, D., Dominique, Jayme, and L.) that they were working as prostitutes when they initially got into defendant's car to perform sexual acts for a fee. Although defendant concedes that all of the women objected to his use of a knife, he claims that as to the five who were working as prostitutes, their objections to his use of the knife were insufficient to negate their prior consent to the sexual acts. Accordingly, he contends, the evidence failed to show that "the sexual acts were non-consensual." We conclude the contention lacks merit.

### A.    *Standard of Review*

"In *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319, the United States Supreme Court held, with regard to the standard on review of the sufficiency of the evidence supporting a criminal conviction, that '[t]he critical inquiry . . . [is] . . . whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. . . . [T]his inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." [Citation.] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' An identical standard applies under the California Constitution. (*People v. Johnson* (1980) 26 Cal.3d 557, 576.) 'In determining whether a reasonable trier of fact could have found defendant guilty beyond a reasonable doubt, the appellate court "must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier [of fact] could reasonably deduce from the evidence."' (*Ibid*.)" (*People v. Staten* (2000) 24 Cal.4th 434, 460.)

5

"Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 403.) A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support" the jury's verdict. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

B.      *Forcible Rape, Oral Copulation, and Sodomy*

Forcible rape is defined as an act of sexual intercourse that "is accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another. (§ 261, subd. (a)(2).)

Forcible oral copulation is defined as an act of oral copulation that is "accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury." (§ 288a, subd. (c)(2)(A).)

Forcible sodomy is defined as "an act of sodomy when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person." (§ 286, subd. (c)(2)(A).)

Lack of consent is an element of the crimes of forcible rape, forcible oral copulation, and forcible sodomy. "In prosecutions under Section 261, 262, 286, 288a, or 289, in which consent is at issue, 'consent' shall be defined to mean positive cooperation in act or attitude pursuant to an exercise of free will. The person must act freely and voluntarily and have knowledge of the nature of the act or transaction involved. [¶] A current or previous dating or marital relationship shall not be sufficient to constitute consent where consent is at issue in a prosecution under Section 261, 262, 286, 288a, or 289." (§ 261.6.)

"Actual consent must be distinguished from submission. [A] victim's decision to submit to an attacker's sexual demands out of fear of bodily injury is not consent

[citations] because the decision is not freely and voluntarily made (§ 261.6).  A selection by the victim of the lesser of two evils—rape versus the violence threatened by the attacker if the victim resists—is hardly an exercise of free will.  [Citation.]"  (*People v. Giardino* (2000) 82 Cal.App.4th 454, 460, fn. 3.)  However, "[i]t is a defense that the accused reasonably and in good faith believed the woman engaged in the act consensually.  [Citation.]"  (*People v. Ireland* (2010) 188 Cal.App.4th 328, 336 (*Ireland*).)

### C.        The Testimony of the Five Victims Regarding the Use of the Knife

At trial, the five women provided similar testimony that they were forced at knifepoint to comply with defendant's demands in order to avoid being injured or killed.

*Nancy's Testimony.*  After Nancy got into defendant's car and agreed to perform sexual acts for a fee, defendant suddenly put a knife to her throat and "told [her] that [she] was going to do whatever he told [her] to do or else he would cut [her] face."  Nancy was scared and believed that defendant, who "seemed really angry," would carry out his threats if she failed to do what he wanted.  When the police arrived, she was crying and calling for help.

*D.'s Testimony.*   After D. got into defendant's car and agreed to perform sexual acts for a fee, defendant put a knife to her neck, said he was a police officer, removed her clothing, handcuffed her wrists behind her back, and told her to do everything he said or he would kill her.  D. felt "helpless" and "scared."

*Dominique's Testimony.*  After Dominique got into defendant's car and agreed to perform sexual acts for a fee, defendant put a knife to her neck and said something that made her "really scared for [her] life.  [She] didn't know if [she] was going to live to see another day."  "[She] said that [she had] a son and [she] want[ed] to live to see [her] son."  "[She] just wanted to do whatever [she] had to do to live to see [her] son."

*Jayme's Testimony.*  After Jayme got into defendant's car and agreed to perform sexual acts for a fee, they had consensual sex and defendant gave her $100.  However, defendant suddenly pulled out a knife and held it to her neck and said, "you know what's

7

going on, don't act stupid." He warned her to be quiet because he did not care if she was hurt or killed. He promised that if she made "him come again," he would let her go. After forcing her to hand over her identification, cell phone, and the $100 he had given her, he told her to "suck his dick" while he drove the car. When she refused and started to cry, he "hit [her] in the back of the head with the knife," which made her realize that she had better "do everything" that he told her to do. After defendant stopped the car, he raped and sodomized her, which made her cry in pain. However, she tried to be quiet because she "didn't want him to hurt [her] with the knife." He then drove her to another location where he handcuffed her wrists behind her back and raped her while they stood next to the car.

*L.'s Testimony*. After L. got into defendant's car and agreed to perform sexual acts for a fee, he put a knife to her throat and told her not to scream. He handcuffed her wrists behind her back and said that he was an undercover sheriff. He also claimed that he was a pimp and that she had better stop working on his girl's corner. He took her identification card and asked a lot of questions. He turned the car light on and showed her some blood on his knife and said, "So don't try anything stupid."


### D.      *Substantial Evidence Supports the Verdict*

Defendant argues that because his use of the knife was a collateral matter—which he compares to playing loud or objectionable music during sex—the victims' objections to the "knife did not communicate a withdrawal of consent to the charged sexual acts." According to defendant, "[i]f the woman's objection to the music is strong enough to make her withdraw consent to performing a sexual act, the law requires that she must communicate an objection to the sexual act, rather than merely object to the music. If she only objects to the music, she cannot claim that the sexual act she performed was without consent." The contention is meritless.

The evidence fails to support defendant's claim that the knife was a collateral matter. On the contrary, the evidence shows that the knife was integral to the commission of forcible rape, forcible oral copulation, and forcible sodomy.

8

This case is factually similar to *Ireland,* in which the victims had also agreed to perform sexual acts for a fee. As in this case, the defendant in *Ireland* suddenly produced a knife and the victims were frightened into submission by actual or implied threats of violence. The defendant in *Ireland* "communicated the express or implied threat that, if they did not continue to cooperate even after he produced the knife and held it to their throats, he would do them harm. As to the victim V.B., the testimony was that appellant told her 'just to cooperate' and she 'won't get hurt.' When the victim J.W. asked appellant what he was doing with the knife, he told her to '"shut up."' She did, because she was afraid he would otherwise 'slice [her] neck off.' He told her not to scream or make any sudden movements and he would not use the knife. When the victim A.H. reacted to appellant putting the knife to her throat by saying 'no,' appellant responded by instructing her to put a condom on his penis, remove her pants, and get on her knees. She complied because she thought he would otherwise kill her. To the victim C.S., appellant said 'do what I say and you won't get hurt.' She cooperated out of fear." (*Ireland*, *supra*, 188 Cal.App.4th at p. 337.)

As the appellate court explained in *Ireland*, where a woman's cooperation is induced by force or fear, she is not required to communicate her lack of consent, even though she initially had agreed, before being threatened with a knife, to perform sexual acts for a fee: "The essence of consent is that it is given out of free will. That is why it can be withdrawn. While there exists a defense to rape based on the defendant's actual and reasonable belief that the victim does consent (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1148; *People v. Mayberry* [(1975)] 15 Cal.3d [143,] 153-158), we do not require that victims communicate their lack of consent. (See *People v. Maury*[, *supra*,] 30 Cal.4th 342, 403 [lack of consent need not be proven by direct testimony but may be inferred from use of force or duress].) We certainly do not require that victims resist. (*People v. Griffin* (2004) 33 Cal.4th 1015, 1024-1025.) Yet this is what appellant proposes here. At the time of the offenses, appellant told his victims to cooperate or be hurt. Now he contends they were required to express to him their lack of cooperation. That cannot be the law. When appellant used the knife and expressly or impliedly

9

threatened his victims, and in the absence of any conduct by the victims indicating that they continued to consent, the previously given consent no longer existed, either in fact or in law.  (Cf. *People v. Washington* (1962) 203 Cal.App.2d 609, 610 ['[c]onsent induced by fear is no consent at all'].)"  (*Ireland*, *supra*, 188 Cal.App.4th at p. 338, fn. omitted.)

Similarly, in this case each victim's cooperation was induced by express or implied threats of bodily harm through the use of a knife and, in some cases, handcuffs and even a blow to the head.  Nancy was threatened at knifepoint that she would suffer a cut on her face if she did not do what she was told.  D. was handcuffed and warned at knifepoint that she would be killed unless she complied.  Dominique was threatened at knifepoint in a way that made her fear for her life.  Jayme was handcuffed, hit on the back of the head with a knife, and threatened with death.  L. was shown a bloody knife and told "don't try anything stupid."  We conclude that because "consent induced by fear is no consent at all" (*People v. Washington*, *supra*, 203 Cal.App.2d at p. 610), the sexual acts that the women were forced to commit at knifepoint were not consensual and, therefore, the verdicts are supported by substantial evidence.

## II.     Defendant's Contention of Instructional Error Is Unsupported by the Record

Defendant contends that the trial court committed instructional error.  He argues that "[t]he instructions on withdrawal of consent, to wit, CALCRIM Nos. 1000, 1015 and 1030, were erroneously limited to withdrawal of consent occurring 'during the act,' which was misleading because it implied that the same rules do not apply where consent is withdrawn before the sexual act.  Because withdrawal of consent was the key issue in the case, the instructional error cannot be deemed harmless."  (Internal record references omitted.)

As we understand the contention, defendant is objecting to the portion of CALCRIM No. 1000 that applies when, during apparently consensual intercourse, the victim expresses an objection and attempts to stop the act, but the defendant forcibly

continues despite the objection.[5] However, as the Attorney General correctly points out, the trial court omitted that portion of the instruction and replaced it with a modification based on *Ireland*, *supra*, 188 Cal.App.4th at pages 337-338.[6] The inserted modification addressed the prosecution's evidence that, notwithstanding the victims' prior consent to perform sexual acts for a fee, they were suddenly threatened with a knife and told that they would be injured or killed if they did not do what they were told. The modified instruction correctly reflected the evidence that defendant employed the knife and threats of physical violence *before* committing the sexual acts alleged in counts 1-3, 5-9, 12-13, 16-20, 22-25, 28-29, and 38-39. Accordingly, the modified instruction did not erroneously suggest, as defendant contends, that consent was withdrawn *during* the

---

[5] That portion of CALCRIM No. 1000 states: "A woman who initially consents to an act of intercourse may change her mind during the act. If she does so, under the law, the act of intercourse is then committed without her consent if: [¶] 1. She communicated to the defendant that she objected to the act of intercourse and attempted to stop the act; [¶] 2. She communicated her objection through words or acts that a reasonable person would have understood as showing her lack of consent; [¶] AND [¶] 3. The defendant forcibly continued the act of intercourse despite her objection."

[6] The modified portion of the instruction stated: "To consent, a woman must act freely and voluntarily and know the nature of the act consented to. In deciding whether the woman acted freely and voluntarily and knew the nature of the act consented to, you may take into consideration all the surrounding circumstances at the time consent was allegedly given and any change of circumstances thereafter, including but not limited to, evidence concerning whether, at the time of the alleged consent, she did or did not know if the defendant intended to accomplish the sexual intercourse by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to the woman, and whether he subsequently did so."

The trial court also modified the final paragraph of CALCRIM No. 1000 by adding the following italicized language: "The defendant is not guilty of rape if *throughout the entire act of sexual intercourse* he actually and reasonably continued to believe that the woman consented to the intercourse. The People have the burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe that the woman consented to the intercourse. If the People have not met this burden, you must find the defendant not guilty."

11

sexual acts. Because the portion of the instruction that defendant challenges on appeal was not given below, we reject his contention as unsupported by the record.

## III. The Court Was Not Required to Instruct on Simple Assault and Battery as Lesser Included Offenses of the Forcible Sex Crimes

Defendant contends the trial court erroneously failed to instruct on simple assault and battery[7] as lesser included offenses of forcible rape, forcible oral copulation, and forcible sodomy. He argues that even though the objections to the use of the knife were insufficient to withdraw the victims' consent to perform sexual acts, the victims are "still protected by laws against assault and battery." He reasons that "[b]ecause appellant assaulted each victim with a knife, it was clear that he was guilty of something" and "it was unfair to give the jury an all-or-nothing choice. Instructions on assault and battery would have given the jury the opportunity to hold appellant responsible for his use of the knife, which was the true nature of appellant's crimes." We are not persuaded.

Once again, defendant bases his contention on the erroneous premise that the knife was a "collateral" matter that had no effect on the victims' prior consent. As we previously discussed, the law is to the contrary. The law provides that "[w]hen appellant used the knife and expressly or impliedly threatened his victims, and in the absence of any conduct by the victims indicating that they continued to consent, the previously given consent no longer existed, either in fact or in law. [Citation.]" (*Ireland*, *supra*, 188 Cal.App.4th at p. 338, fn. omitted.)

"The court is required to instruct on lesser included offenses only when the evidence raises a question whether all the elements of the charged crime have been proved and where a jury could reasonably find that the defendant committed the lesser

---

[7] "An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) "A battery is any willful and unlawful use of force or violence upon the person of another. (§242.) An "[a]ssault is a lesser included offense of a charge of battery. [Citation.]" (*People v. Paul* (1978) 78 Cal.App.3d 32, 45.)

12

but not the greater crime. (See *People v. Wickersham* (1982) 32 Cal.3d 307, 324-325 [disapproved on another ground in *People v. Barton* (1995) 12 Cal.4th 186, 201].) However, instructions on lesser included offenses are not required when the evidence shows that, if guilty at all, defendant committed the greater crime. (*People v. Leach* (1985) 41 Cal.3d 92, 106.)" (*People v. Lema* (1987) 188 Cal.App.3d 1541, 1544-1545.) We conclude the trial court had no sua sponte duty to instruct on simple assault and battery as lesser included offenses of the forcible sex crimes.

## IV.    Erica's Preliminary Hearing Testimony Was Properly Admitted at Trial

Defendant contends the trial court erred in admitting Erica's preliminary hearing testimony at trial. We disagree.

### A.    The Applicable Law

Former testimony from a prior proceeding is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness. (Evid. Code, § 1291.) A witness is unavailable if he or she is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (Evid. Code, § 240, subd. (a)(5).)

"'[D]ue diligence' is 'incapable of a mechanical definition,' but it 'connotes persevering application, untiring efforts in good earnest, efforts of a substantial character.' [Citations.] Relevant considerations include '"whether the search was timely begun"' [citation], the importance of the witness's testimony [citation], and whether leads were competently explored [citation]." (*People v. Cromer* (2001) 24 Cal.4th 889, 904 (*Cromer*).)

We review the trial court's determination of the historical facts, including the prosecution's account of their failed efforts to locate the absent witness, under a deferential standard of review. (*Cromer*, *supra*, 24 Cal.4th at p. 900.) We independently review the trial court's determination whether the prosecution's efforts to locate an absent witness are sufficient to justify an exception to the defendant's constitutionally

13

guaranteed right of confrontation at trial. (*Id*. at p. 901.) But an appellate court will not reverse a trial court's determination simply because the defendant can conceive in hindsight of a proposed further step or avenue left unexplored. (*People v. Diaz* (2002) 95 Cal.App.4th 695, 706.) Nor can the court impose upon the prosecution the task of keeping continuous tabs on a witness, for the administrative burden would be prohibitive. (*Ibid.*)

### B.     Additional Facts

About a week before trial, Deputy District Attorney Martha Carrillo attempted to locate Erica by contacting Erica's mother. Although this had always worked in the past, Erica's mother gave Erica's new cell phone number to Carrillo and told her that she had tried but could not locate Erica. Carrillo left several messages at that number and sent several email messages to an email address that she believed was Erica's. When those efforts failed to produce a response from Erica, Carrillo requested the assistance of an investigator.

Investigator Yvette Hartwell left messages on Erica's cell phone and spoke with Erica's mother, who told Hartwell that Erica had said, "[I]t's my f'ing life. I don't want to relive this stuff." Hartwell visited several of Erica's previous addresses and checked with the jails, hospitals, and the coroner's office. Hartwell kept calling Erica's cell phone until the cell phone was disconnected the day before trial.

Detective Teresa Curtis tried to locate Erica by checking a previous address, examining arrest records, and contacting Erica's probation officer, whose last contact with Erica had occurred in October 2011. Curtis also sent several email messages to an email address associated with Erica.

After the above efforts to locate Erica failed, Carrillo sought to introduce Erica's preliminary hearing testimony at trial. Carrillo, Hartwell, and Curtis testified as to their efforts to locate Erica. Carrillo stated that she had spoken with Erica about her trial testimony on at least five occasions. Until Erica suddenly disappeared just before trial, Carrillo had no reason to believe that Erica would "be a difficult witness" to secure for

14

trial. Although Erica "was very emotional about not wanting to relive this" and asked if she would have to testify again, Erica had assured Carrillo that she would stay in touch with her mother, who was "battling cancer," and could be reached through her. In Carrillo's opinion, because Erica was now actively refusing to come forward, extending the search for another month would be futile because all reasonable leads had been exhausted.

Defense counsel objected that the prosecution did not exercise due diligence by failing to look for Erica until two court days before trial. Defense counsel argued that in light of Erica's reluctance to testify at trial, the prosecution should have started the search much earlier. Defense counsel pointed out that no efforts were made to look for Erica during the "three-day weekend" before trial.

### C. The Trial Court's Finding That Erica Was Unavailable as a Witness Is Supported by Substantial Evidence

The trial court concluded that under the circumstances, the prosecution's efforts were diligent and timely. The trial court found that the prosecution had exhausted all available leads and exercised due diligence in trying to locate Erica, who was unavailable as a witness.

The trial court based its determination on the following evidence. "There were contacts with the mother and she called back and so it was only late in the game that the People learned that she was actively avoiding being a witness in the case." Erica's phone was still in service when messages were left by Carrillo and Hartwell. Even though Erica was a "reluctant" witness at the preliminary hearing, she did not display "active avoidance" until "much later in the game." Erica's active avoidance was the "real problem," which did not become "crystal clear" until Erica's phone was disconnected the day before trial.

We distinguish this case from *Cromer*, *supra*, 24 Cal.4th 889, where the police learned that a witness had disappeared seven months before trial. The prosecution issued subpoenas three months later, but did not serve them. The prosecution's investigators

15

visited the witness's home a month before trial, but waited two days before going to her mother's residence where she reportedly was living. When the investigators were informed that the mother was out but would return the next day, the investigators did not return to talk to her. Based on this record, the Supreme Court concluded that "serious efforts to locate [the witness] were unreasonably delayed, and investigation of promising information was unreasonably curtailed." (*Id.* at p. 904.) In comparison, the efforts made to find Erica in this case were serious and diligent.

We further conclude that any error in the admission of Erica's prior testimony was harmless under either the *Watson* or *Chapman*[8] standards of prejudice. The evidence of defendant's guilt was overwhelming. Erica's testimony was corroborated at trial by Officer Alejandro Higareda, who had taken her crime report on the night of the rape, and Cathy Adams, the nurse who had examined her at the hospital and found cuts, bruises, and abrasions that were consistent with being handcuffed and held at knifepoint. In addition, Erica's testimony was corroborated by defendant's admissions that he had handcuffed the "last two" women, which included Erica, that "[a]ll the girls are the same," that he "picked them up," he drove them to a location, "they all performed sexual acts on [him] while [he] had a knife on their throat[s]," and they all were blindfolded with their bras.

## V.  Sentencing Issues

Defendant was convicted of 23 counts of forcible rape, forcible oral copulation, and forcible sodomy, plus five counts of kidnapping to commit another crime. As to each forcible sex crime, the jury found true the special allegations that subjected defendant to consecutive terms of 25 years to life under the One Strike law. (§ 667.61.)[9]

---

[8]     *People v. Watson* (1956) 46 Cal.2d 818; *Chapman v. California* (1967) 386 U.S. 18.

[9]     The One Strike law applies to crimes including forcible rape (§ 261, subd. (a)(2)), forcible sodomy (§ 286, subd. (c)(2)), and forcible oral copulation (§ 288a, subd. (c)(2)).

(Fn. continued.)

16

The One Strike law "was enacted to ensure that serious sexual offenders receive long prison sentences regardless whether they have any prior criminal convictions. (*People v. Wutzke* (2002) 28 Cal.4th 923, 926, 929.)" (*People v. Luna* (2012) 209 Cal.App.4th 460, 465.) The trial court does not have discretion "to strike any of the circumstances specified in subdivision (d) or (e)." (§ 667.61, subd. (f).) "'Having been pled and proven, the circumstance of [the specified offense] which gives rise to the 25 years to life punishment under section 667.61, subdivision (d) "shall not" be stricken. [Citations.]'" (*People v. Jackson* (1998) 66 Cal.App.4th 182, 193-194.)

A.      *The Court Mistakenly Imposed an Unauthorized Sentence on Count 41*

The Attorney General contends, and defendant agrees, that the trial court mistakenly treated count 41, kidnapping to commit another crime, as a forcible sex crime and erroneously sentenced defendant on count 41 to a consecutive term of 25 years to life under the One Strike law. As a result of that error, the trial court imposed 24 rather than 23 consecutive sentences of 25 years to life under the One Strike law on counts 1-3, 5-9, 12-13, 16-20, 22-25, 28-29, 38-39, and, erroneously, 41, resulting in an erroneous sentence of 600 years to life, rather than the correct sentence of 575 years to life. It is

Section 667.61, subdivision (a) provides in relevant part: "[A]ny person who is convicted of an offense specified in subdivision (c) under one or more of the circumstances specified in subdivision (d) or under two or more of the circumstances specified in subdivision (e) shall be punished by imprisonment in the state prison for 25 years to life."

Section 667.6, subdivision (d) provides in relevant part: "A full, separate, and consecutive term shall be imposed for each violation of an offense specified in subdivision (e) if the crimes involve separate victims or involve the same victim on separate occasions. [¶] In determining whether crimes against a single victim were committed on separate occasions under this subdivision, the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon his or her actions and nevertheless resumed sexually assaultive behavior. Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned his or her opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions."

undisputed that if the trial court had been alerted to its error, it would have imposed the same sentence on count 41 as it did on counts 4, 15, 21, and 27 (which were also kidnapping counts) of life with possibility of parole, and would have stayed punishment on count 41 (including all fines and assessments) under section 654.

Because the sentence imposed on count 41 was erroneous, it is subject to correction on appeal as an unauthorized sentence. (*In re Renfrow* (2008) 164 Cal.App.4th 1251, 1256.) We therefore remand with directions to correct the abstract to reflect a corrected sentence of 23 consecutive terms of 25 years to life on counts 1-3, 5-9, 12-13, 16-20, 22-25, 28-29, and 38-39, and a life sentence on counts 4, 15, 21, 27, and 41. The sentences (including fines and penalty assessments) on counts 4, 15, 21, 27, and 41 are stayed under section 654.

> **B.** *The Sentence Does Not Constitute Cruel or Unusual Punishment Under the California Constitution*

Defendant contends that his sentence under the One Strike law constitutes cruel or unusual punishment under the California Constitution. We disagree.

"A punishment is cruel or unusual within the meaning of the California Constitution if 'it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.' (*In re Lynch* (1972) 8 Cal.3d 410, 424.) In *Lynch*, the Supreme Court extracted from prior decisions a four-pronged analysis for claims of disproportionate sentencing. (*Id*. at pp. 425-427.) The first two prongs of the analysis focus on the nature of the offense and the offender 'with particular regard to the degree of danger both present to society.' (*Id*. at p. 425.) In contemplating the nature of the offense we consider not only the crime as defined by the Legislature but also '"the facts of the crime in question" . . . including such factors as its motive, the way it was committed, the extent of the defendant's involvement, and the consequences of his acts.' (*People v. Dillon* [(1983)] 34 Cal.3d [441,] 479.) In considering the nature of the offender we look at such factors as the defendant's 'age, prior criminality, personal characteristics, and state of mind.' (*Id*. at p. 479.) The third

18

and fourth prongs involve comparing the challenged punishment with punishments in California and other jurisdictions for offenses which are as serious or more serious. (*People v. Dillon*, *supra*, 34 Cal.3d at p. 487 & fn. 38; *In re Lynch*, *supra*, 8 Cal.3d at pp. 426-427.)" (*People v. Estrada* (1997) 57 Cal.App.4th 1270, 1278.)

### 1. The Nature of the Offense and the Offender

Under any objectively reasonable standard, defendant is a violent serial rapist who preyed on vulnerable women who, because they were engaged in the illegal occupation of prostitution, were often reluctant to report the crimes he committed against them. The fact that defendant does not have a serious criminal history is undoubtedly a reflection of the extreme vulnerability of his victims.

In terms of the degree of danger that defendant presents to society, we have no difficulty finding him to be a highly dangerous individual who is likely to reoffend if he is not incarcerated for the rest of his life. The crimes in this case are even more serious than in *People v. Sullivan* (2007) 151 Cal.App.4th 524, which involved a sentence of 210 years to life for six counts of robbery, with two prior serious felony convictions and two prior prison terms. In rejecting the defendant's claim of cruel and unusual punishment, the court in *Sullivan* described the crimes in that case, which involved "a series of robberies which included threatened acts of violence with a deadly weapon," as "acts of a most heinous nature." (*Id.* at p. 570.) The defendant in *Sullivan* was described as "an incorrigible recidivist offender who presents a most grave and extreme level of danger to society." (*Ibid.*) We conclude that in comparison to *Sullivan*, the crimes in this case—a long string of forcible rapes, forcible oral copulations, and forcible sodomy against women who were confined in an automobile and threatened at knifepoint with death or bodily injury while blindfolded and in some cases handcuffed—are far more heinous.

### 2. Other Punishments in This State

Defendant contends that his punishment is disproportionate to the punishments imposed for first or second degree murder. He argues that because he must serve 600

years (now 575 years) prior to being eligible for parole, his sentence is identical to the sentence he would have received for committing 24 (now 23) first degree murders.

We believe that the punishment in this case is not disproportionate to the lengthy indeterminate sentences that have been upheld in other One Strike and Three Strike cases. (See e.g., *People v. Alvarado* (2001) 87 Cal.App.4th 178 [One Strike sentence of 15 years to life for rape during commission of burglary was not cruel or unusual punishment]; *People v. Estrada*, *supra*, 57 Cal.App.4th 1270 [One Strike sentence of 25 years to life for forcible rape in course of burglary was not cruel or unusual punishment]; *Lockyer v. Andrade* (2003) 538 U.S. 63 [two consecutive terms of 25 years to life for third strike conviction of petty theft was not unconstitutional]; *People v. Cartwright* (1995) 39 Cal.App.4th 1123 [third strike sentence consisting of an indeterminate term of 375 years to life and determinate term of 53 years for violent sexual assaults on three women was not cruel and unusual punishment].)

"""Whether a particular punishment is disproportionate to the offense is, of course, a question of degree.  The choice of fitting and proper penalties is not an exact science, but a legislative skill involving an appraisal of the evils to be corrected, the weighing of practical alternatives, consideration of relevant policy factors, and responsiveness to the public will; in appropriate cases, some leeway for experimentation may also be permissible.  The judiciary, accordingly, should not interfere in this process unless a statute prescribes a penalty 'out of all proportion to the offense' [citations], i.e., so severe in relation to the crime as to violate the prohibition against cruel or unusual punishment." [Citation.]  "Defining crime and determining punishment are matters uniquely legislative in nature, resting within the Legislature's sole discretion." [Citation.]' (*People v. Lewis* (1993) 21 Cal.App.4th 243, 251.)  '"Only when the punishment is out of all proportion to the offense and is clearly an extraordinary penalty for a crime of ordinary gravity committed under ordinary circumstances, do the courts denounce it as unusual." [Citation.]' (*Ibid.*)

"'Our Supreme Court has emphasized "the considerable burden a defendant must overcome in challenging a penalty as cruel or unusual.  The doctrine of separation of

powers is firmly entrenched in the law of California, and a court should not lightly encroach on matters which are uniquely in the domain of the Legislature. Perhaps foremost among these are the definition of crime and the determination of punishment. While these intrinsically legislative functions are circumscribed by the constitutional limits of article I, section 17 [of the California Constitution], the validity of enactments will not be questioned 'unless their unconstitutionality clearly, positively, and unmistakably appears.'" [Citation.]' (*People v. Kinsey* (1995) 40 Cal.App.4th 1621, 1630.)" (*People v. Sullivan*, *supra*, 151 Cal.App.4th at p. 569.)

### 3. Punishments in Other States

Without citing any specific examples, defendant argues that because comparable "'one-strike' laws are drafted much more narrowly than in California, and generally target serious violent offenders, appellant's sentence constituted cruel and unusual punishment."

A similar contention was rejected by the court in *People v. Martinez* (1999) 71 Cal.App.4th 1502, 1516, with which we agree: "That California's punishment scheme is among the most extreme does not compel the conclusion that it is unconstitutionally cruel or unusual. This state constitutional consideration does not require California to march in lockstep with other states in fashioning a penal code. It does not require 'conforming our Penal Code to the "majority rule" or the least common denominator of penalties nationwide.' (*People v. Wingo* (1975) 14 Cal.3d 169, 179.) Otherwise, California could never take the toughest stance against repeat offenders or any other type of criminal conduct. [¶] '[T]he needs and concerns of a particular state may induce it to treat certain crimes or particular repeat offenders more severely than any other state. . . . [¶] Whether a particular punishment is disproportionate to the offense is a question of degree. The choice of fitting and proper penalty is not an exact science but a legislative skill involving an appraisal of the evils to be corrected, the weighing of practical alternatives, consideration of relevant policy factors, and responsiveness to the public will. In some cases, leeway for experimentation may be permissible. Thus, the judiciary should not

interfere in the process unless a statute prescribes a penalty "'out of all proportion to the offense.'"" (*People v. Cooper* [(1996)] 43 Cal.App.4th [815,] 827, quoting *In re Lynch*, *supra*, 8 Cal.3d at pp. 423-424.)"

## C.     The Sentence Does Not Constitute Cruel and Unusual Punishment Under the Federal Constitution

Defendant contends that his sentence constitutes cruel and unusual punishment under the federal Constitution.  The contention lacks merit.

"The Eighth Amendment prohibits imposition of a sentence that is 'grossly disproportionate' to the severity of the crime.  (*Ewing v. California* (2003) 538 U.S. 11, 20-21; *People v. Carmony* (2005) 127 Cal.App.4th 1066, 1076 . . . .)  In a noncapital case, however, successful proportionality challenges are '"exceedingly rare."'  (*Ewing*, *supra*, 538 U.S. at pp. 20-21 [sentence of 25 years to life in prison for felony theft of golf clubs under California's "Three Strikes" law, with prior felonies of robbery and burglary, did not violate federal prohibition on cruel and unusual punishment].)  In the rare case where gross disproportionality can be inferred from (1) the gravity of the offense and harshness of the penalty, the court will consider (2) sentences imposed for other offenses in the same jurisdiction and (3) sentences imposed for commission of the same crimes in other jurisdictions.  (*Harmelin v. Michigan* (1991) 501 U.S. 957, 1005 [sentence of life in prison without possibility of parole, for possessing 672 grams of cocaine, was not cruel and unusual punishment].)  '[I]t is only in the rare case where a comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality that the second and third criteria come into play.' (*People v. Meeks* (2004) 123 Cal.App.4th 695, 707, citing *Harmelin v. Michigan*, *supra*, 501 U.S. at p. 1005 (conc. opn. of Kennedy, J.).)" (*People v. Haller* (2009) 174 Cal.App.4th 1080, 1087-1088.)

For the reasons discussed in the preceding sections, we conclude that defendant has failed to show that his sentence was grossly disproportionate to the severity of the crimes in violation of the Eighth Amendment.

*D.     Custody Credits*

The Attorney General contends, and defendant agrees, that the abstract of judgment fails to reflect the correct number of presentence custody credits.  The trial court stated at sentencing that defendant was entitled to 911 presentence custody credits (consisting of 793 actual days in custody and 118 days good time/work time), which was erroneously recorded in the abstract as 900 credits.  We order that the abstract be corrected to reflect that defendant was given 911 presentence custody credits.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 185 [errors in abstract may be corrected on appeal].)

**DISPOSITION**

The matter is remanded with directions to correct the abstract of judgment to reflect sentences of:  (1) 23 consecutive terms of 25 years to life on counts 1-3, 5-9, 12-13, 16-20, 22-25, 28-29, and 38-39; and (2) life with possibility of parole on counts 4, 15, 21, 27, and 41, which, along with the fines and penalty assessments on those counts, are stayed under section 654.  The abstract is also to be corrected to reflect 911 presentence custody credits.  The clerk is directed to forward a copy of the amended abstract to the Department of Corrections and Rehabilitation.  As modified, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

SUZUKAWA, J.

We concur:


EPSTEIN, P. J.


WILLHITE, J.

23