Filed 7/9/21  P. v. Graham CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C087027 |
| Plaintiff and Respondent, | (Super. Ct. No. 16FE017331) |
| v. | |
| CRYSTAL GRAHAM, | |
| Defendant and Appellant. | |

Defendant Crystal Graham brought the victim, E.C., to a motel room where he was attacked by her codefendant Joe Navarro, who held a box cutter to the victim's neck and relieved him of his wallet and keys.  Defendant took the victim's bank card, went to an ATM, called Navarro who forced the victim to disclose his personal identification number (PIN), and withdrew $400.  Defendant and Navarro left the motel in two vehicles, a Toyota 4Runner, in which they had arrived, and the victim's Prius, with the victim first in the backseat of the 4Runner and then transferred to the Prius driven by defendant.  The victim escaped by untying the tape binding his hands, jumping out of the

1

Prius when it slowed down on the freeway, and waving to passersby. Defendant exited the freeway, abandoned the Prius, and fled in the 4Runner with Navarro.

Defendant and Navarro were tried jointly by separate juries. Defendant's jury convicted her of kidnapping to commit a robbery (Pen. Code, § 209, subd. (b)(1)) and kidnapping in the course of a carjacking (*id.*, § 209.5, subd. (a)).[1] The trial court sentenced defendant to two consecutive terms of life with the possibility of parole on these offenses. The jury also convicted defendant of second degree robbery (§ 211) and simple kidnapping (§ 207, subd. (a)). On these offenses, the court stayed middle term sentences of three and five years, respectively, under section 654.

Defendant contends her conviction and sentence for simple kidnapping must be reversed as a lesser included offense of kidnapping to commit a robbery and kidnapping during a carjacking. The Attorney General concedes the error and we agree.

In supplemental briefing, defendant seeks remand for the trial court to conduct a hearing on mental health diversion under section 1001.36, which became effective after she was convicted and sentenced. (Stats. 2018, ch. 34, § 24.) Defendant argues that section 1001.36 should be applied retroactively under *In re Estrada* (1965) 63 Cal.2d 740 and *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299. We agree that section 1001.36 is retroactive and will remand to the trial court to determine whether defendant qualifies under the statute.

We conclude that defendant's remaining contentions are without merit or constitute harmless error, or both.

---

[1] All undesignated statutory references are to the Penal Code.

## FACTUAL AND PROCEDURAL BACKGROUND

On August 27, 2016, defendant and Navarro rented a room in a Sacramento motel. Video surveillance from the motel shows defendant entering with Navarro, both of them laughing and smiling while talking to the motel clerk.

The victim testified that, on August 28, 2016, he got off work from a night shift and drove his Prius to a gas station. He had heard that the gas station was in a "stroll area" for prostitutes. He was eating peanuts when defendant walked by in front of his car. Defendant smiled at him, opened the passenger door, and got in his car. He told defendant to get out but she put her hand on his crotch and his hand on her breast. Defendant said she needed a ride back to her motel. He decided to drive her there to get her out of his car. On the way to the motel, he stopped at a liquor store.

When they arrived at the motel, defendant invited him to come into the room for a drink but he hesitated. Defendant went into the room and called to him to come in.

When the victim entered the room, Navarro grabbed him from the left side and pushed him face down on the bed. Navarro was wearing a Halloween mask. He was holding a box cutter with the blade exposed. Navarro had metal chains wrapped around his other hand.

While the victim was face down, his wallet and keys were taken out of his pants. He assumed it was Navarro who did it. The wallet contained his Golden One Credit Union Visa card and ID. Defendant had his card. Defendant and Navarro asked him for the PIN.

Defendant left the room. Navarro was pressing the box cutter against the victim's neck. Navarro was still asking him for the PIN. Navarro threatened to hurt him. He was mixed up because he had several PINs. He finally got the right one. He could hear Navarro repeating the PIN on the telephone. He later learned that $400 had been withdrawn from his bank account at an ATM.

3

Defendant came back to the motel room. Navarro made the victim stand up. Navarro took off his mask. Either defendant or Navarro told him to stand in the corner. They told him to take off his clothes but changed their minds.

Defendant hit the victim with a hat she was wearing. Defendant was no longer friendly; she acted angry. The victim was afraid of both Navarro and defendant.

Navarro taped the victim's wrists together in front of him and put tape over his eyes. Defendant opened the door to the motel room and went out first. They took the tape off his eyes. Navarro put a towel over his taped wrists. Navarro shoved him towards the 4Runner. Navarro put him in the rear passenger-side seat, sitting up. Navarro was driving the 4Runner. Defendant was driving the victim's car.

When they were getting ready to put him in the car, the victim heard defendant say that they were going to take him "to the woods." He was afraid he might be shot or killed or left in the woods.

Both vehicles got on the freeway and off at the next exit. They stopped at a vacant lot. Navarro grabbed the victim and shoved him in the back seat of the Prius. Navarro went to a gas station in the 4Runner. As Navarro was pumping gas, defendant and the victim circled the parking lot and then pulled in behind the 4Runner.

When Navarro was finished getting gas, both vehicles left the gas station and got on the freeway, with defendant driving in front of Navarro. Defendant did not talk to the victim. The victim started biting the end of the tape to get it off his hands. He thought defendant saw him in the rearview mirror. Defendant pulled over and stopped. Navarro stopped, too, and came over to the Prius. Defendant said that the victim was trying to take off the tape. Navarro said, "No, he's fine."

Navarro left and defendant drove off. The victim kept unraveling the tape. Defendant was looking back at him. When defendant saw him unravel a length of the tape, she stopped on the freeway again. The victim opened the door while the car was still moving and tried to get out. Navarro came up quickly from behind and almost hit

him. The victim's hands were still bound. He ran down the shoulder of the freeway towards traffic. He held his hands up to show they were bound. Defendant and Navarro drove off. The victim ran back to an exit ramp.

A husband and wife couple testified they were driving east on the freeway and saw the victim running west with his hands bound waving his arms. The husband got off at an exit and his wife called 911. The victim walked up to their car and the police arrived shortly after.

Another husband and wife couple were driving east on the freeway when they saw a red Prius in front of a gray or silver 4Runner suddenly pull over. They saw a man jump out with his arms in the air running west on the shoulder. Two people got out of the vehicles, jumped right back in, and drove off in the slow lane with the Prius in front. At this point, the vehicles were behind the couple, who saw turn signals indicating the Prius and 4Runner were going to get off at the next exit. All three cars got off at the exit. The couple eventually allowed the Prius and 4Runner to go ahead and took pictures of the license plates. The couple decided to go back to the exit where others were helping the man who jumped out of the car. On the way, they noticed the Prius abandoned in a parking lot.

A witness testified he was driving east on the freeway and saw a red Prius in front of a 4Runner, both vehicles spinning their tires to get back on the freeway. The Prius attempted to pass the witness, who saw the female driver of the Prius looking in her rearview mirror. In his side mirror, the witness saw the driver of the 4Runner motioning for her to get over. The Prius got behind the witness and all three vehicles took the exit. The witness saw the driver of the 4Runner motioning for the Prius to turn right. Both cars went around the witness and turned right. The witness followed and saw the Prius park. The female driver got out and ran to get in the 4Runner, which drove off.

Defendant testified in her defense. She was engaged in prostitution from 2010 to 2013. Defendant was incarcerated for six months from January 2016 to June 2016 for

felony vehicle theft in Monterey.  As a result of the felony conviction her children were placed in foster care.  She was attempting reunification with her children.

Defendant met Navarro in early August 2016.  She called a friend to pick her up and they drove to a gas station where they got in a 4Runner with Navarro and his girlfriend.  The group went to a house where defendant had a conversation with Navarro.  Defendant told Navarro where her children went to school.  Navarro told defendant that he used to work for the probation department and had connections and resources in the area.  Defendant relapsed on alcohol that night.

On August 10, 2016, defendant encountered a woman she knew from when she was incarcerated.  The woman wanted methamphetamine.  Defendant called Navarro, who picked them up.  Eventually, they were pulled over by the police, who arrested Navarro and released the women.  Navarro's wife called defendant's phone and defendant went to their apartment.  Navarro's wife wanted help with his bail but defendant didn't have the funds.  Navarro talked to his wife on defendant's phone.  He called back and said that he had been released.  When Navarro returned, he told his wife to lock the entrance and said that defendant was leaving with him.  They drove around but defendant did not return to the apartment.

Defendant testified that, after this incident, Navarro would call defendant's phone "ask[ing] where I was, who am I with, that I needed to tell him who I was with, where I was at all times; that he could basically find me anywhere, because he knows everything, so I cannot hide."

Defendant testified that "the next time [she] had an encounter with" Navarro, she was meeting with a team of social workers and therapists to let them know she had relapsed and wanted to enter an in-patient program.  Navarro demanded to know where she was and picked her up from the meeting.  They went to a friend's house in the marina where Navarro did drugs.  Afterwards, defendant told Navarro she couldn't do this anymore and needed to not have contact with him.  On the way from the marina to

6

Salinas, Navarro pulled into a strawberry field at sunset. Defendant's phone was going dead and she could not call or text anybody. She testified that "it just really freaked me out."

They followed a man who Navarro said was his uncle to another part of the field. There, Navarro slapped defendant and said, "Bitch, you're not going nowhere. Don't you know who I am?" Navarro told defendant she was going to make money for him. He shot himself up with drugs, injected defendant with drugs in the anus, and penetrated her anally. Navarro threatened defendant, telling her he could bury her right then and no one would find out. He said he knew where her kids went to school, knew everything about her, and her kids would not be able to hide.

Navarro asked defendant where she had made money. Defendant said out of state and Sacramento. Navarro said he had a son in Sacramento. They went to Sacramento. Defendant did "two car dates" on Watt Avenue in Sacramento, while Navarro was close by in his truck. She made $200 from the two dates. They checked into a motel using defendant's ID.

They went back to Watt Avenue the next morning. Navarro told defendant she needed to make some more money before they checked out. Defendant was walking away from Watt Avenue when she saw the victim. He went around a couple times. She waved at him and he waved back. He pulled into a 7-Eleven and defendant got into his car. Defendant touched his private area and took out her breast, which he touched. Defendant asked him if he was the police and he said, no. She asked if he wanted a date and he said, yes. Defendant said she had a room and the price was $100. He did not want to go the room but agreed to go when defendant said the price was $60. On the way to the motel, they went to a liquor store and he bought a bottle of tequila and condoms.

When they got to the motel, the victim was not sure about coming in. Defendant told him no one was there and offered to look first and wave him in. Defendant opened the door and waved him in. Defendant did not think Navarro was in the room. She

7

thought Navarro was in the 4Runner she saw parked out front, because he was "always paranoid."

When the victim came in the room, defendant took a drink of the tequila and began to open the condoms when Navarro came out of the closet wearing a Halloween mask. Navarro ordered the victim down on the bed and demanded his wallet. Navarro told defendant to go to an ATM and ordered the victim to give Navarro his PIN. Defendant went to an ATM and got $400. Navarro told defendant to get the $400. Defendant was concerned that Navarro might hurt the victim and wanted to follow instructions.

When defendant got back, the victim was still on the bed. She gave Navarro the money and he ordered the victim to get up, go to the corner, and get undressed. Defendant suggested they take the victim to the woods because she thought Navarro wanted to strip and hurt him in the room.

Navarro put the victim in the 4Runner. Defendant got in the Prius and they got on the freeway. Defendant then got off the freeway onto some side streets. There, Navarro put the victim into the Prius. Defendant was relieved because she was not going to hurt him.

When they got to a gas station, defendant drove around in circles to get other people's attention. They got back on the freeway. Defendant did not "want to be a part of the continuance of any of this." She pulled over hoping that the victim would get out. He didn't, so she pulled over another time and that's when he got out. Navarro pulled up, asked what defendant was doing, and told her to go. Defendant got on the freeway and got off at the next exit.

Defendant and Navarro went back to Salinas. In Salinas, they picked up Navarro's girlfriend. Navarro told defendant to get in the driver's seat. Defendant saw for the first time that Navarro had a gun, though she had seen bullets before. They drove to Monterey and parked. They dropped off Navarro's girlfriend and went to a field where

Navarro wanted to have sex. Defendant said she had gotten her period. They went to a McDonald's. Defendant disposed of the gun in a garbage can. She told Navarro she did not want to be part of this and would rather call the police. He drove off. That was the last time she saw him.

Defendant went to Nebraska because she had heard that Navarro was arrested and she needed to leave town. Defendant knew there was a warrant out for her arrest but she did not call the police or the district attorney to report that she was actually a victim. Defendant was arrested in Nebraska and transported in custody to Sacramento.

Defendant denied that she was planning on robbing anyone with Navarro when they checked into the motel. She denied that she intended to steal money from the victim or steal his car. Defendant testified that she drove the victim's car to protect him from harm and her intent was to release him.

Navarro did not testify.

Defendant and Navarro were charged in count one with kidnapping to commit robbery (§ 209, subd. (b)(1)), in count two with kidnapping during a carjacking (§ 209.5, subd. (a)), in count three with second degree robbery (§ 211), and in count four with kidnapping (§ 207, subd. (a)).

The trial court granted defendant's motion to empanel two juries after observing that Navarro "gave a formal statement to law enforcement wherein he implicates himself and the other defendant. [¶] As of right now . . . he's not testifying. So I think we do need two juries."

The jury found defendant guilty on all four counts. The trial court sentenced defendant to two consecutive terms of life with the possibility of parole on counts one and two and stayed middle term sentences on counts three and four.

## DISCUSSION

### *Simple Kidnapping*

Defendant contends that her conviction for simple kidnapping (§ 207, subd. (a)) should be reversed because it is a lesser included offense of kidnapping to commit robbery (§ 209, subd. (b)(1)) and kidnapping during carjacking (§ 209.5). Defendant argues "[i]t is well-established that a conviction for [a lesser included offense] cannot stand where the defendant is also convicted of the greater offense."

The Attorney General agrees that simple kidnapping is a lesser included offense of kidnapping to commit robbery and defendant's simple kidnapping conviction should be reversed on that basis. The Attorney General also agrees that simple kidnapping is a lesser included offense of kidnapping during a carjacking, but maintains that we need not reach that issue. We conclude that defendant's kidnapping conviction must be reversed as a lesser included offense of both kidnapping to commit robbery and kidnapping during a carjacking.

"A judicially created exception to the general rule permitting multiple convictions 'prohibits multiple convictions based on necessarily included offenses.' [Citation.]" (*People v. Reed* (2006) 38 Cal.4th 1224, 1227.) "When a defendant is convicted of a greater and lesser included offense, reversal of the conviction for the lesser included offense is required." (*People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1416 (*Dowdell*).)

It is well established that simple kidnapping is a lesser included offense of kidnapping to commit robbery. (*People v. Lewis* (2008) 43 Cal.4th 415, 518, disapproved on another ground in *People v. Black* (2014) 58 Cal.4th 912, 919; *People v. Jackson* (1998) 66 Cal.App.4th 182, 189 (*Jackson*); *People v. John* (1983) 149 Cal.App.3d 798, 810.) Simple kidnapping is also a lesser included offense of kidnapping to facilitate a carjacking. (*People v. Stringer* (2019) 41 Cal.App.5th 974, 987-988 (*Stringer*); see also *People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1368.)

Therefore, defendant's conviction for simple kidnapping must be reversed. (*Jackson, supra*, 66 Cal.App.4th at p. 190; *Stringer, supra,* 41 Cal.App.5th at p. 988.)

*Cross-Examination Regarding Navarro's Out-of-court Statement Implicating Defendant*

Defendant contends that the trial court erred in allowing the prosecutor to cross-examine her about Navarro's out-of-court statement to the police implicating her in a plan to rob the victim. The Attorney General maintains there was no error because Navarro's statement itself was not admitted in evidence before defendant's jury, and, if there was error, it was harmless.

We conclude that defendant is correct that the court erred. A violation of the confrontation clause occurs when the prosecutor asks questions disclosing an out-of-court statement incriminating a defendant made by a nontestifying codefendant. (See *People v. Shipe* (1975) 49 Cal.App.3d 343, 349-351 (*Shipe*); *Douglas v. Alabama* (1965) 380 U.S. 415, 419 [13 L.Ed.2d 934] (*Douglas*); *People v. Perez* (2016) 243 Cal.App.4th 863, 887 (*Perez*); *People v. Murillo* (2014) 231 Cal.App.4th 448, 456 (*Murillo*); *People v. Rios* (1985) 163 Cal.App.3d 852, 864.) However, we agree with the Attorney General that the error was harmless, given the overwhelming evidence against defendant.

As mentioned, the trial court empaneled two juries because the prosecution intended to introduce Navarro's statement to the police and Navarro was not going to testify. The court explained that Navarro's statement "was made to law enforcement, so under *Crawford* . . . it was actually made, a formal statement taken by the police. So all the normal testimonial statement requirements apply, and that would mean that we would need two juries if he's not testifying, and apparently he's not."[2]

---

[2] In *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177], the United States Supreme Court held that the confrontation clause strictly excludes out-of-court statements that are "testimonial," unless the declarant is unavailable and the defendant has a prior opportunity for cross-examination. (*Id.* at pp. 51-54, 59.) The "core class of 'testimonial

11

During the trial, Navarro's interview by a police detective was played to his jury but not defendant's. In the interview, Navarro related that defendant "said she was supposed to bring some guy over and just get him - get his money, but - and then we were gonna take off." Navarro attributed to defendant the change in plan to tie up the victim and take him with them.

Prior to defendant's testimony, the prosecutor stated her intention to cross-examine defendant about Navarro's statement to the police. The prosecutor argued that defendant knew about the statement, having received a copy in discovery, and had talked about the statement in telephone calls in jail, making it "fair game" to show defendant's bias and state of mind. The prosecutor acknowledged she didn't know whether defendant would comment on the statement in her testimony. The trial court said that, depending on what defendant testified, the court had no problem with the prosecution asking defendant if she knew what Navarro had said, in order to undermine defendant's credibility in "pointing fingers" at Navarro.

Defendant's counsel objected to any questions regarding Navarro's statement without defendant having an opportunity to cross-examine Navarro. The court indicated such questions would be allowed, depending on whether defendant shaped her testimony to lessen her culpability and increase Navarro's in response to his statement. The court questioned how the statement would be introduced, but considered the possibility that defendant might answer a question in a way that would allow the prosecutor to inquire whether her answer was related to what Navarro had said in his statement. The court said that if the prosecution started presenting evidence to defendant's jury about what Navarro said in his statement, defense counsel could object that the prosecution would be

statements' " includes "[s]tatements taken by police officers in the course of interrogations . . . ." (*Id.* at pp. 51, 52.)

12

"implicating her without her being able to cross-examine him." The prosecutor declared, "I'm not going to be reading in his statement."

On cross-examination, defendant answered in the affirmative to a question whether she was shocked that Navarro jumped out the closet in the motel room with a mask and box cutter. The prosecutor then asked, "That was your plan; right?" Defendant said, no. The prosecutor took this exchange as an opportunity to question defendant about Navarro's out-of-court statement: "You know what Mr. Navarro said regarding your involvement; right?" Defendant's counsel objected. After an off-the-record sidebar, the court overruled the objection. The prosecutor then asked, "You're aware of what Mr. Navarro said about the two of you having a plan; correct?" Defendant answered, no. Defendant confirmed she had Navarro's statement but testified repeatedly that she did not look at it. Defendant denied that she had talked to a person she was dating about what Navarro had said, but acknowledged she had "stated there was a statement against me from Mr. Navarro." The prosecutor read an excerpt of a transcript of a telephone call from jail in which defendant discussed with an unidentified male a conversation she had had with her attorney about Navarro's statement.

At the end of the day, the court recapped the off-the-record sidebar. The court noted that defendant's counsel objected to the prosecutor's cross-examination on the same grounds as earlier. But the court observed that in the earlier discussion it had not "categorically" precluded evidence of Navarro's statement. Rather, the prosecutor's ability to question defendant about the statement depended on defendant's responses during examination and cross-examination. The court said it overruled the objection based on the belief that questions about Navarro's statement were "fair game." The court concluded it was permissible for the prosecutor to briefly question defendant on the

13

subject. The court also commented that the prosecutor had not disclosed that Navarro's statement was made to the police, thereby "sanitizing" it.[3]

The next day the prosecutor played an audio recording of defendant's telephone call from jail in which defendant said, "my attorney came to see me yesterday and he said it looks like my co-d, is uh, well he admitted to the, some of the stuff and he was like when I got to Sacramento I changed or whatever . . . ." In response to questions from the prosecutor and the court, defendant denied knowing what Navarro had said about her involvement.

Defendant's counsel again objected, arguing that the prosecutor was using cross-examination as a "back door" to get Navarro's statement into evidence. The prosecutor reiterated that the statement was "fair game" because defendant knew what Navarro had said in the statement. The prosecutor asserted and the court agreed that defendant's knowledge of Navarro's statement was relevant to her credibility in terms of how "she may have couched her testimony, how she may have presented her defense."

There was one more round of testimony and objection pertaining to Navarro's statement. This time Navarro's counsel asked defendant, "And you're aware that [Navarro] implicated you?" Navarro's counsel then stated, "He said you were in on this whole thing." Defendant expressed some confusion about the word "implicated." The court then said, "Well, [Navarro's counsel is] asking, you knew that he said, somewhere, that you were involved. You were involved in the whole thing." Defendant testified that she "was aware of his statement." Navarro's counsel continued, "And you're aware that he had suggested that you changed the plan." Defendant responded, "There was no

---

[3] We doubt that defendant's jury was unaware that Navarro's out-of-court statement was made to authorities, in light of questions by the prosecutor referring to it as a written statement (e.g., "You have, in fact, read his statement, isn't that true?") and defendant's response that she had received the statement.

14

plan." Navarro's counsel asked, "You're aware that [Navarro] said, when you got back to the room, it was -- we weren't just going to rob this guy, now we have to take him somewhere. That was your idea, wasn't it?" Defendant's counsel objected to "this whole line of questioning." The court overruled the objection. Defendant responded that she wanted to get the victim out of the room for his safety.

In yet another discussion of the matter outside the presence of the jury, the court noted defendant's counsel's many objections to references to an out-of-court statement by Navarro. The court explained that it overruled the objections because testimony regarding defendant's knowledge of Navarro's statement was relevant to her credibility and "a couple of statements, wherein the jury was told he said something implicating her" did not "rise[] to the level of a *Crawford* violation."

The confrontation clause of the Sixth Amendment to the federal Constitution provides that " '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.' The right of confrontation includes the right of cross-examination." (*People v. Fletcher* (1996) 13 Cal.4th 451, 455, citing *Pointer v. Texas* (1965) 380 U.S. 400, 404, 406-407 [13 L.Ed.2d 923].)

" 'The primary object of [the confrontation clause] was to prevent depositions or *ex parte* affidavits . . . being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.' [Citation.]" (*Douglas, supra*, 380 U.S. at pp. 418-419.)

A defendant is denied cross-examination secured by the confrontation clause when an out-of-court statement by a nontestifying accomplice or codefendant implicating the defendant is presented to the jury in the text of questions. While "not technically testimony," in the jury's mind it may be the equivalent of testimony that the codefendant

15

made the statement and the statement is true. (*Douglas, supra*, 380 U.S. at p. 419; *Murillo, supra*, 231 Cal.App.4th at p. 450.) A prosecutor "may not, under the guise of cross-examination, get before the jury what is tantamount to devastating direct testimony." (*Shipe, supra*, 49 Cal.App.3d at p. 349.)

We conclude that the prosecution's cross-examination about Navarro's statement concerning defendant's involvement was "tantamount to devastating direct testimony." (*Shipe, supra*, 49 Cal.App.3d at p. 349.) The heart of the defense was that defendant was unaware that Navarro was going to rob the victim in the motel room, and, after Navarro attacked the victim, followed Navarro's directions out of fear of him and to protect the victim. Questions by the prosecutor, counsel for Navarro, and even the court, regarding defendant's awareness of Navarro's statements about her "involvement," their "plan," and that defendant had "changed the plan," created the inference that Navarro had related a version of the events in which defendant was equally or even more responsible for what the victim endured. (*Ibid.*) This cross-examination targeted the defense's theory without affording defendant an opportunity to test the credibility of its source, Navarro, by cross-examination before the jury.

As mentioned, the trial court commented that it was permissible for the prosecutor to ask defendant "a couple of questions" and "briefly" get into Navarro's out-of-court statement about defendant's involvement. Similarly, in the last of its three discussions explaining the basis for overruling defendant's counsel's repeated objections, the court expressed doubt "that a couple statements, wherein the jury was told he said something implicating her, rises to the level of a *Crawford* violation . . . ." We do not agree.

To be sure, in *Douglas*, the prosecutor posed 21 questions of a witness who refused to answer, formulated by reading statements from the witness's confession that also incriminated the defendant, and asking if the witness agreed with each statement. (*Douglas, supra*, 380 U.S. at pp. 416-417 & fn. 2.) The confession was not offered in evidence. (*Id.* at p. 417.) In *Shipe*, the prosecutor asked two witnesses, who had

16

confessed to being accessories to the murder for which the defendant was on trial, a long series of questions about details of the crime, which inculpated the defendant. (*Shipe, supra*, 49 Cal.App.3d at pp. 346-349.) Both witnesses refused to answer the questions. (*Ibid.*) From the facts of *Douglas* and *Shipe*, it might be argued that the confrontation clause is violated where the prosecutor ask numerous questions disclosing the details of an out-of-court statement by a nontestifying accomplice or codefendant.

We conclude that whether a confrontation clause violation has occurred does not turn on the number of questions. A single question can be "tantamount to devastating direct testimony." (*Shipe, supra*, 49 Cal.App.3d at p. 349.) Here, the prosecutor's questions were aimed at critical factual issue: whether defendant planned with Navarro to rob the victim. Cross-examination by both the prosecutor and Navarro's counsel disclosed that Navarro had made a statement indicating defendant was in on the plan. Thus, the prosecutor began her closing argument, "On August 28th of 2016, [defendant] had a plan. She had a plan with Mr. Navarro to find a john." The prosecutor argued that defendant brought the victim back to the motel where Navarro was waiting. "That was all part of the plan." Since Navarro did not testify, the prosecutor's cross-examination of defendant could be taken by the jury as evidence that she was a willing participant or even an instigator of the plan.

Moreover, contrary to the trial court's observation, cross-examination was not limited to a "couple of statements" by Navarro implicating defendant. The prosecutor and Navarro's counsel put multiple questions to defendant about Navarro's statement regarding the "plan" and defendant's "involvement." The trial court also referred to Navarro's incriminating statements in seeking to clarify a question from Navarro's counsel: "Well, she's asking, you knew that he said, somewhere, that you were involved. You were involved in the whole thing." This sequence of events is unlike, for example, *Perez v. Muniz* (E.D. Cal., Jan. 15, 2019, No. 1:18-cv-00190-LJO-SKO (HC)) 2019 U.S. Dist. Lexis 7312, where the prosecutor asked one question that was improper under

17

*Douglas* and *Shipe* and the trial court sustained defense counsel's objection, ordered the prosecutor's question stricken, and admonished the jury that "[w]hen I strike something, you're to assume it didn't happen." (*Id.* at p. *51.)

The Attorney General, however, argues that "[t]he trial court did not violate [defendant's] right to confront witnesses . . . by allowing the prosecutor and Navarro's counsel to cross-examine her about Navarro's extrajudicial statement, because the statement was not admitted in [defendant's] trial." *Douglas* is to the contrary, holding that the questions themselves violate the confrontation clause by disclosing information from an out-of-court statement without giving the defendant an opportunity to cross-examine the declarant. (*Douglas, supra*, 380 U.S. at p. 419.) "The questions create the illusion of testimony." (*Murillo, supra*, 231 Cal.App.4th at p. 450; cf. *Perez, supra*, 243 Cal.App.4th at p. 887 [rejecting as contrary to *Douglas* the argument that there was no confrontation clause violation because there was no testimony].) If the Attorney General's argument were correct, a prosecutor could avoid a confrontation clause violation simply by cross-examining a defendant about a codefendant's incriminating out-of-court statements without offering the statement as evidence. But this is exactly the tactic the United States Supreme Court condemned in *Douglas*. (*Douglas, supra*, at p. 419.)

Although the trial court erred in allowing cross-examination of defendant regarding Navarro's out-of-court statements, the error was harmless. The standard we apply to confrontation clause violations is whether the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705]; *People v. Livingston* (2012) 53 Cal.4th 1145, 1159; *People v. Morgain* (2009) 177 Cal.App.4th 454, 468 (*Morgain*).)

This standard is readily met by ample direct evidence of defendant's guilt. Defendant testified that she agreed to lower the price for a sex act from $100 to $60, which induced the victim to come to the motel room. Defendant testified she had made

18

$100 for each of two "car dates" the previous day, which was defendant's regular rate. The previous car dates also took place in the daytime. There was no reason to reduce the price except to bring the victim to the motel, where more money could be made by robbing him. Also, previously Navarro had been nearby when defendant had dates in the car, but that day he was absent after dropping her off at the Watt Avenue location. Defendant's explanation for her belief Navarro was not in the motel room—that he was "always paranoid"—was not plausible.

Defendant had multiple opportunities to escape from Navarro and still protect the victim, as she claimed she wanted to do. Defendant took the victim's card and went to an ATM. At that point, she could have notified the police and not used his card to obtain money. Instead, as the victim testified, defendant spoke to Navarro on the phone to get his PIN and withdrew $400 from his account. When the victim was switched to his Prius with defendant driving, she could have driven them both off to safety. Navarro would have no way of stopping defendant without drawing attention to a crime in progress in broad daylight. Defendant could have driven away from Navarro when he stopped for gas, but instead she waited for him. Defendant could also have driven off in the Prius after the victim escaped, but instead she stopped, got out of the Prius and in with Navarro. Further, the victim testified that when he began to unravel his bindings to escape, defendant stopped to alert Navarro. The victim testified that the entire time he was with defendant and Navarro, defendant never said anything to Navarro indicating reluctance to participate in the robbery and kidnapping or fear of Navarro.

In light of the overwhelming evidence that defendant was a willing participant in the robbery and kidnapping of the victim, the court's error in allowing the prosecutor and Navarro's counsel to cross-examine defendant about Navarro's out-of-court statement was harmless. (*Morgain, supra*, 177 Cal.App.4th at p. 469.)

19

*Evidence That Navarro Told Defendant He Had Killed and Kidnapped Before*

The trial court excluded under Evidence Code section 352 defendant's testimony that Navarro told her he had killed and kidnapped before. Defendant asserts that the court thereby denied her a fair trial in violation of due process.

"Review of a trial court decision pursuant to Evidence Code section 352 is subject to abuse of discretion analysis." (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 352 (*Greenberger*); *People v. Shoemaker* (1982) 135 Cal.App.3d 442, 449 (*Shoemaker*) ["absent a clear showing of abuse, we are compelled to uphold the trial court's exercise of discretion under section 352"].)

Here, we find no error because the evidence was not of "*significant* probative value" to the defense. (*People v. Reeder* (1978) 82 Cal.App.3d 543, 553 (*Reeder*); *Greenberger, supra*, 58 Cal.App.4th at p. 352.) Additionally, to the extent it was error to exclude this evidence, the error was harmless. (*Shoemaker, supra*, 135 Cal.App.3d at p. 450.)

In proceedings before defendant testified, the court and counsel for the parties engaged in an extended discussion regarding whether defendant could testify that Navarro told her that he kidnapped and murdered someone in Mexico as relevant to her fear of Navarro.[4] The court determined that this evidence should be excluded under Evidence Code section 352 as unfairly prejudicial to Navarro, who would not testify and could not explain himself. However, the court ruled that defendant would be allowed to explain that she was afraid of Navarro because he was violent.

Defendant's counsel produced a newspaper article describing Navarro and two others being sentenced to federal firearms charges for forcibly bringing a murder suspect

---

[4] The court and counsel also discussed testimony regarding Navarro's prior sex offense. Defendant's counsel confirmed to the court that he did not intend to ask about this subject matter, because defendant did not know about it.

20

from Mexico to the United States. Counsel stated that he found the article after defendant related a conversation with Navarro "in which he ran down a bunch of stuff in order to scare her." The court decided to conduct an Evidence Code section 402 hearing on the subject.

At the hearing, defendant testified that during the encounter in the strawberry field Navarro told her that "he's kidnapped and killed before." Defendant further testified that Navarro pulled out his phone and showed her the article about his kidnapping someone in Mexico, which he brought up on Google. In response to questions from the court, defendant added that Navarro said he had kidnapped "[f]amilies."

The court ruled that defendant could not testify about these statements. Everything else related to her fear of Navarro—e.g., that, in the strawberry field, he slapped her, injected her with drugs, and said he could kill and bury her and no one would find out—would be allowed.

Defendant's counsel objected that the court was making a determination that defendant was not credible, which undermined her right to present a defense. The court responded that "under [Evidence Code section] 352, we have the ability to control the flow of evidence, what the jury hears, even things, by the way, that are arguably relevant and I think that particular evidence, I think would be somewhat cumulative to the Court about why she was scared of him, and I think the nature of it is as such that it has a unique ability to inflame the jury."

In *Reeder*, the court said that "Evidence Code section 352 must bow to the due process right of a defendant to a fair trial and to his right to present all relevant evidence of *significant* probative value to his defense." (*Reeder, supra*, 82 Cal.App.3d at p. 553.) The court added that "[w]e do not mean to imply, however, that a defendant has a constitutional right to present all relevant evidence in his favor, no matter how limited in probative value such evidence will be so as to preclude the trial court from using Evidence Code section 352." (*Ibid*.)

21

We find that the excluded evidence here was of slight probative value. Defendant's proposed testimony that Navarro said he had kidnapped and killed before was unaccompanied by any details, including how Navarro had kidnapped "[f]amilies." The article described Navarro forcibly abducting a murder suspect from Mexico to face prosecution in the United States. This was an act of vigilantism against a murder suspect that, while deplorable, was not the equivalent of kidnapping and robbing a victim like the victim in this case. Indeed, according to the article, Navarro was not sentenced on a kidnapping charge but rather an 18-month charge for possession of a firearm by a felon, and his apparent objective was to facilitate prosecution of the murder suspect. As the trial court observed, there was "nothing [in the article] about [Navarro] killing anybody." If anything, this evidence tended to undercut defendant's evidence of her fear of Navarro as a violent criminal.

Moreover, the trial court correctly observed that the evidence excluded was cumulative of other testimony by defendant regarding her fear of Navarro. (*Shoemaker, supra*, 135 Cal.App.3d at pp. 449-450; *Greenberger, supra*, 58 Cal.App.4th at p. 352.) Defendant testified that she was afraid of Navarro because of his violent threats when she told him she wanted to end contact with him. She testified that, in the strawberry field, Navarro (1) "slapped me and said, 'Bitch, you're not going nowhere. Don't you know who I am?' "; (2) told her she "was going to make money for him," (3) ordered her in the back seat, injected her with drugs in the anus and anally raped her; (4) "said that nobody would find out and him and I were the only ones here; that he could bury me right now and nobody would know."

We conclude that the trial court did not abuse its discretion in determining the evidence excluded was of minimal probative value and cumulative.

Moreover, in light of the abundant evidence of Navarro's violent threats and acts towards defendant, any error in failing to admit testimony of Navarro's statement that he had killed and kidnapped before could not be prejudicial to defendant. (*Shoemaker,*

*supra*, 135 Cal.App.3d at p. 450.)  As described, the evidence of defendant's guilt as a willing participant in the robbery and kidnapping of the victim was overwhelming. (*Ibid.*)  Any error in depriving defendant of a due process right to present character evidence against Navarro was harmless beyond a reasonable doubt.  (*Ibid.,* citing *Chapman v. California, supra*, 386 U.S. 18.)

*Prosecutor's Questions Regarding Defendant's Burden to Prove Innocence*

Defendant claims that the trial court erred in overruling defense counsel's objection when the prosecutor improperly suggested it was defendant's burden to prove her innocence.

In cross-examining defendant regarding her knowledge of Navarro's statement, the prosecutor asked, "Now, Ms. Graham, you know that you need to convince the jury that you're innocent; right?"  Defense counsel objected but did not state a basis for the objection and the court overruled it.  Shortly thereafter, the prosecutor asked, "Okay.  Ms. Graham, your job is to make sure that the jury believes your story, so you are found innocent?"  Defendant's counsel did not object to this question.

It is improper for a prosecutor to suggest that " 'a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence.' "  (*People v. Woods* (2006) 146 Cal.App.4th 106, 112, quoting *People v. Bradford* (1997) 15 Cal.4th 1229, 1340.)  We agree with defendant that the prosecutor's questions crossed the line between asking defendant to acknowledge "the common-sense notion that a criminal defendant would presumably want a jury to acquit her" and imposing a burden on defendant to prove her innocence.

However, defendant's claim was forfeited by her failure to object on the ground that she now asserts on appeal and request that the court admonish the jury to disregard the prosecutor's questions.  In *People v. Samayoa* (1997) 15 Cal.4th 795, the defendant complained that the prosecutor's closing argument "attempted to mislead the jury

23

regarding the prosecution's burden of proof by indicating that defendant bore the burden of raising a reasonable doubt as to his guilt." (*Id.* at p. 842.) The prosecutor asked rhetorically whether a defense expert's findings had been able to " 'create a reasonable doubt' " in the jurors' minds. (*Ibid.*) The court said, "[a]s a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*Id.* at p. 841, citing *People v. Berryman* (1993) 6 Cal.4th 1048, 1072; *Dowdell, supra*, 227 Cal.App.4th at p. 1406 [" 'to preserve a claim of prosecutorial misconduct for appeal, a criminal defendant must make a timely objection, make known the basis of his objection, and ask the trial court to admonish the jury.' [Citation]"].)

Defendant's counsel objected to the first question but did not articulate any grounds for the objection. This is insufficient to preserve the issue on appeal. In *People v. Cook* (2006) 39 Cal.4th 566, the defendant argued "the prosecutor impermissibly sought to shift the burden of proof" (*id.* at p. 607) in questions to an expert witness regarding whether the defense could have conducted independent testing of bullets removed from the murder victims. The court overruled a defense objection that the question was argumentative. The court said, "[o]nly on appeal does defendant contend that question improperly shifted the burden of proof to the defense. Because defendant failed to object to the question on that ground at trial, he has forfeited that claim." (*Ibid.*)

On reply, defendant argues that because the court quickly overruled an objection to a follow-up question to the prosecutor's first question—"You don't want the jury to think that you're innocent, that's not your goal?"—it would have been futile to make any further objection to the second question. (*People v. Hill* (1998) 17 Cal.4th 800, 820 ["a defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile"].) This argument does not address the defendant's failure to state an objection to the first question on the ground that it

24

improperly shifted the burden of proof or request an admonition on that basis. In addition, defendant's counsel did state an objection to the follow-up question but on the ground that it "misstates the evidence," once again omitting the basis for the objection that defendant asserts on appeal. On this record, we do not find that a proper objection and request for admonition would have been futile.

Defendant concludes that the cumulative prejudicial impact of the trial court's error, combined with errors regarding Navarro's out-of-court statement and his threats to defendant claiming that he had killed and kidnapped people before, warrants reversal. Here, where we have found error, it was harmless or forfeited. Therefore, we reject defendant's claim of cumulative error. (*People v. Linton* (2013) 56 Cal.4th 1146, 1197; *People v. Tully* (2012) 54 Cal.4th 952, 1061.)

*Consecutive Sentences for Kidnapping to Commit Robbery*
*and Kidnapping During Carjacking*

Defendant contends that the trial court erred in not staying under section 654 either the sentence for kidnapping to commit robbery or kidnapping during carjacking. Defendant's position is that "[s]ince the kidnapping element of both counts involved the identical conduct of moving [the victim] against his will when [defendant] and Navarro took him from the motel room and drove with him to the area where he eventually escaped, the court could only impose one term of punishment for the multiple sentences."

"Section 654, subdivision (a), provides that '[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision.' " (*People v. Carter* (2019) 34 Cal.App.5th 831, 841-842 (*Carter*).)

"In addition to precluding multiple punishments for a single act, section 654 also precludes multiple punishments for an indivisible course of conduct. [Citations.] ' " 'Whether a course of criminal conduct is divisible and therefore gives rise to more

than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " ' [Citation.]" (*Carter, supra*, 34 Cal.App.5th at p. 841.)

"Whether a defendant had multiple intents or objectives is a question of fact for the sentencing court [citation], and its findings will be upheld on appeal if supported by substantial evidence. [Citation.] 'We review the trial court's determination in the light most favorable to the [People] and presume the existence of every fact the trial court could reasonably deduce from the evidence.' [Citation.]" (*Carter, supra*, 34 Cal.App.5th at p. 841; *People v. Tom* (2018) 22 Cal.App.5th 250, 260.)

In a sentencing memorandum, defendant argued that both kidnapping to commit robbery and kidnapping during carjacking "were committed with a single intent and objective—getting money." Defendant relied on *Dowdell, supra*, 227 Cal.App.4th 1388, in which the court found that one or the other of counts for kidnapping for ransom or extortion or kidnapping during carjacking should be stayed under section 654, because "[t]hroughout the course of the kidnapping, [defendant's] sole objective was to obtain money." (*Id.* at p. 1415.) In *Dowdell*, defendant brought the victim to two different ATMs, where defendant committed both kidnapping offenses to obtain money from victim. (*Id.* at pp. 1415-1416.)

In ruling that section 654 did not apply, the trial court commented that defendant's argument "has some initial appeal." The court continued, "[m]y problem with it is ultimately, though, it's the way things worked out in the end. . . . [The victim] was taken against his will, he was robbed, it was a kidnapping for robbery there, and then they then decide to take the car. There was really no reason to take the car. . . . [¶] So to me, that suggests then that carjacking was -- had its own independent, separate objective or motive. There was something that they were after, there was some other plan other than the robbery when they did the carjacking and took him against his will in connection with

that offense. [¶] So I think they're independent objectives, I don't think 654 would [pre]clude sentencing the defendant on both those counts."

Substantial evidence supports the trial court's conclusion that defendant had separate objectives for kidnapping for robbery and kidnapping to facilitate a carjacking. The objective of kidnapping for robbery was certainly to obtain money. Kidnapping while carjacking involved a change of plan. The victim testified that he heard defendant say she and Navarro were taking him "to the woods," where he thought they would hurt or abandon him. Defendant's objective in the kidnapping during a carjacking was to prevent the victim from promptly alerting the police in order to allow defendant and Navarro to make their escape.

To the extent kidnapping to rob and during the carjacking overlapped, the California Supreme Court has observed that section 654 did not apply where "cases have found separate, although sometimes simultaneous, objectives under the facts." (*People v. Latimer* (1993) 5 Cal.4th 1203, 1212; *People v. Douglas* (1995) 39 Cal.App.4th 1385, 1393 [accord]; see also *People v. Davis* (1987) 191 Cal.App.3d 1365, 1369 [where defendant had multiple objectives to rob and rape and kidnapping was common to both, defendant could be separately punished for kidnapping for the purpose of robbery and rape]; *People v. Booth* (1988) 201 Cal.App.3d 1499, 1505 [§ 654 did not apply where defendant entered victim's homes with the dual objectives to rape and steal]; *People v. Nichols* (1994) 29 Cal.App.4th 1651, 1657-1658 [defendant who kidnapped a truck driver and hijacked his truck and threatened the victim if he reported the crime had distinct objectives to hijack the truck and to avoid detection and conviction by dissuading and intimidating the victim].)

Because defendant had distinct objectives in kidnapping the victim to rob him and kidnapping while carjacking to prevent him from reporting a crime, the trial court did not violate section 654 in sentencing defendant for both kidnapping to commit robbery and kidnapping during a carjacking.

*Mental Health Diversion Under Section 1001.36*

Defendant urges us to remand this case to the trial court to conduct a mental diversion hearing under section 1001.36, a statute that became effective while this appeal was pending.

The debate among appellate courts whether section 1001.36 is retroactive was ongoing when the parties submitted their supplemental briefing on the issue. The debate is over. In *People v. Frahs* (2020) 9 Cal.5th 618, the Supreme Court concluded that the statute is retroactive and "that a conditional limited remand for the trial court to conduct a mental health diversion eligibility hearing is warranted when, as here, the record affirmatively discloses that the defendant appears to meet at least the first threshold eligibility requirement for mental health diversion—the defendant suffers from a qualifying mental disorder (§ 1001.36, subd. (b)(1)(A))." (*Id.* at p. 640.)

Section 1001.36, subdivision (a), authorizes trial courts to grant "pretrial diversion" to defendants with certain diagnosed mental disorders. The mental disorders enumerated in the statute include posttraumatic stress disorder or PTSD. (§ 1001.36, subd. (b)(1)(A).) At trial, defendant testified that (1) she was diagnosed with PTSD in 2016, (2) PTSD affects her behavior when she is under stress, and (3) she was under stress when she was with Navarro in Sacramento. The Attorney General does not dispute defendant's PTSD diagnosis but confines its argument to the position that section 1001.36 is not retroactive. That position is no longer tenable in light of the Supreme Court's decision in *Frahs*. Section 1001.36 must be applied retroactively to all mentally ill defendants whose convictions are not yet final on appeal.

# DISPOSITION

Defendant's conviction and sentence for simple kidnapping (§ 207, subd. (a)) is reversed.  Further, the judgment is conditionally reversed and the case remanded to the trial court for a diversion eligibility hearing under section 1001.36.  If the court determines that defendant qualifies, then diversion may be granted.  However, if the court determines that defendant is ineligible for diversion or fails to complete the diversion program, defendant's convictions and sentence on all offenses except simple kidnapping shall be reinstated.


_____/s/_____
RAYE, P. J.



We concur:


_____/s/_____
HULL, J.



_____/s/_____
MAURO, J.


29